**CHUNG LING CO., LTD.,
et al., Plaintiffs,**

**v.**

**UNITED STATES, Defendant,**

**and**

**National Knitwear and Sportswear Association, Defendant–Intervenor.**

**Court No. 90–10–00528.**

United States Court of International Trade.

July 28, 1992.

Whitman & Ransom, Charles H. Bayar, New York City, Far East United Law Office, Charles Y.W. Chiu and Swidler & Berlin, Chartered, Washington, D.C. (Lester Hyman and H.P. Goldfield, of counsel), for plaintiffs Chung Ling Co., Ltd. et al.

Grunfeld, Desiderio, Lebowitz & Silverman, Bruce M. Mitchell and David L. Simon, Washington, D.C., for plaintiff Comitex Knitters, Ltd.

Steptoe & Johnson, Stewart A. Baker and Gracia M. Berg, Washington, D.C., for plaintiffs Cheonji Sanup, Inc. et al.

Office of Gen. Counsel, U.S. Intern. Trade Com'n, Lyn M. Schlitt, Gen. Counsel, James A. Toupin, Asst. Gen. Counsel, and William T. Kane, Washington, D.C., for defendant.

Gibson, Dunn & Crutcher, Joseph H. Price and Kathrin Sears, Washington, D.C., for defendant-intervenor.

## MEMORANDUM OPINION AND ORDER

CARMAN, Judge:

In these consolidated antidumping actions, certain producers and exporters of manmade fiber ("MMF") sweaters, Chung Ling Co., Ltd. and other Taiwan plaintiffs ("Taiwan plaintiffs"), Comitex Knitters, Ltd. of Hong Kong ("Hong Kong plaintiff"), and Cheonji Sanup, Inc. and other Korean plaintiffs ("Korean plaintiffs"), contest the final affirmative administrative determinations of the International Trade Commission rendered pursuant to 19 U.S.C. § 1673d(b) in its material injury investigations, *Sweaters Wholly or in Chief Weight of Manmade Fibers from Hong Kong, the Republic of Korea, and Taiwan*, Inv. Nos. 731–TA–448, 449 and 450 (Final), USITC Pub. No. 2312 (Sept.1990) (*"ITC Report"*).

The National Knitwear and Sportswear Association ("NKSA"), a national trade association representing approximately 243 domestic sweater manufacturers and the petitioner in the antidumping investigations at the administrative level before the United States Department of Commerce and the Commission, appears in these actions as defendant-intervenor in support of the Commission.

The Commission by a vote of two (Commissioners Seely G. Lodwick and David B. Rohr) to one (Commissioner Don E. Newquist, dissenting), with one Commissioner (Anne E. Brunsdale) not participating, rendered its final affirmative determinations in the subject investigations on September 10, 1990 and notice thereof was published in the Federal Register on September 19, 1990. 55 Fed.Reg. 38,588. The final affirmative injury determinations of the Commission paved the way for the Commerce

Department, that found "dumping" (sales at less than fair value), to issue final anti-dumping duty orders, published on September 24, 1990. 55 Fed.Reg. 39,033 (Taiwan), 39,035 (Hong Kong) and 39,036 (Korea). The Commission majority's views and determinations are referred to herein as those of the "Commission" or "ITC."

Separate actions challenging the Commission's final determinations were consolidated under the above-captioned court number by order of April 19, 1991. This consolidated action is presently before the court on plaintiffs' motions under CIT Rule 56.1 for judgment on the agency record. Jurisdiction is predicated on 19 U.S.C. § 1516a(a)(2)(A)(i)(II) and 28 U.S.C. § 1581(c).

Briefly, plaintiffs claim that the subject determinations are unsupported by substantial evidence and were otherwise not in accordance with law, and request that the action be remanded.

The administrative record, *ITC Report*, and legal memoranda of the parties are voluminous—the "briefs" on these motions alone comprising some 600 pages. The record, *ITC Report*, and the parties' thorough and helpful briefs have been carefully considered, but in the interests of brevity they are referred to herein only to the extent necessary to address the issues that warrant remand. For the following reasons, this action is remanded to the Commission.

## DISCUSSION

### *Standard of Review*

The standard of judicial review for Commission final injury determinations is set forth in 19 U.S.C. § 1516a(b)(1)(B): "The court shall hold unlawful any determination, finding, or conclusion found * * * to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." "[S]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *American Spring Wire Corp. v. United States*, 8 CIT 20, 21, 590 F.Supp. 1273, 1276 (1984) (quoting *Universal Cam-era Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951)), *aff'd sub nom. Armco, Inc. v. United States*, 3 Fed.Cir. (T) 123, 760 F.2d 249 (1985).

### *Adverse Inference Rule*

■ In the preliminary investigations, the Commission expressed great concern for the poor responsiveness of the domestic producers to the Commission's questionnaires. Although refusing to adopt an adverse inference with respect to injury against the domestic industry, the Commission admonished in its preliminary report that "if the response rate by the domestic industry in any final investigations is not substantially above present levels, the Commission may reconsider the propriety of drawing an adverse inference against the domestic industry." *Sweaters Wholly or in Chief Weight of Manmade Fibers from Hong Kong, the Republic of Korea, and Taiwan*, Inv. Nos. 731–TA–448–450 (Preliminary), USITC Pub. 2234 at 17 n. 46 (Nov.1989).

In these final investigations, of the 197 questionnaires it sent to a selective sampling of U.S. sweater producers, the Commission received 83 responses—fewer than one-half. The Commission explained the disappointingly low response rate on the basis of the lack of the appropriate financial and accounting data by the producers to provide the detailed information sought by the lengthy questionnaires.

Plaintiffs argue that due to inadequate producer questionnaire response, the Commission's data base is not representative of the U.S. MMF sweater industry in the critical financial and economic indicators of injury relied on for the affirmative determinations. Although the extent of the U.S. sweater industry coverage the Commission obtained from the producer questionnaire responses was fairly broad based, representing 49 percent of the total quantity of sweaters produced and 72 percent in terms of shipments, plaintiffs stress that these industry coverage figures are for *all* sweaters, MMF and non-MMF, and therefore are misleading; with regard to the industry and like product under investiga-

tion, MMF sweaters, questionnaire responses were received from a mere *nine producers accounting for only fifteen percent of MMF sweater production in 1989. ITC Report* at 32 n. 94; *Final Staff Report* at A–41, A–57. What is more, these sparse MMF sweater producer responses were often lacking specific responses to data requested by the questionnaires relevant to pricing and the financial conditions and trends in the industry.

Citing *Atlantic Sugar, Ltd. v. United States,* 4 CIT 248, 251, 553 F.Supp. 1055, 1059 (1982), and a long line of agency precedents, plaintiffs contend that the Commission should have drawn an adverse inference that the data in the possession of the producer questionnaire recipients who did not respond and the data selectively withheld in the partial responses would show no material injury by reason of the subject imports.

In *Alberta Pork Producers' Marketing Bd. v. United States,* 11 CIT 563, 580, 669 F.Supp. 445, 459 (1987) (quoting *International Union (UAW) v. N.L.R.B.,* 459 F.2d 1329, 1336 (D.C.Cir.1972)), the court stated: "The adverse inference rule provides that 'when a party has relevant evidence within his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him.'" Continuing, the *Alberta Pork* court held:

> [T]he Commission has discretion in deciding whether or not to draw an adverse inference with respect to injury based upon a party's failure to participate in the administrative proceeding, *but the decision in either event must be based upon a sound rationale.* In investigations where the Commission is able to gather the necessary information through its subpoena power or other independent sources, there is very little reason to draw an adverse inference for failure to respond to questionnaires.

*Id.* (emphasis added). *See also Trent Tube Div. v. United States,* 14 CIT ——, ——, 752 F.Supp. 468, 476 (1990).

The Commission addressed adverse inference in its report as follows:

> [T]hrough voluntary responses and the use of the Commission's subpoena power, the Commission has received significantly more questionnaire responses than in the preliminary investigations. In light of this, and the absence of expressions of opposition to the petition by domestic producers, we have decided not to draw an inference that the lack of more complete questionnaire data is evidence that the domestic industry is not materially injured. Rather, although the level of response by U.S. producers was not ideal, we have used this data and data from secondary sources in examining the question of material injury.

*ITC Report* at 28.

*Alberta Pork* teaches that although the Commission's decision on adverse inference is committed to agency discretion, its decision *must be based upon a sound rationale.* Plaintiffs insist that in these investigations the Commission abused its discretion *by failing to articulate a sound rationale.* The court must agree. The Commission's stated justifications for not drawing an adverse inference—(1) the Commission received significantly more questionnaire responses in the final than in the preliminary investigations and (2) the absence of expressions of opposition to the petition by domestic producers—although superficially plausible, are inherently unsound.

As to the first reason, improved questionnaire response rate in the final investigations: since the Commission's baseline point of reference was the astonishingly low rate of response in the preliminary investigations, even the substantially increased *but still low rate of response in the final investigations* left the Commission with limited financial data unrepresentative of the domestic "industry" as defined by the statute. *See* 19 U.S.C. § 1677(4)(A).

The problem is not that the Commission failed to make diligent efforts to seek the necessary data—indeed, it made extraordinary efforts by issuing subpoenas to ten domestic producers who failed to voluntarily respond—but rather that the domestic

industry failed to sufficiently cooperate. As aptly observed in *Atlantic Sugar, Ltd. v. United States*, 2 Fed.Cir. (T) 130, 134, 744 F.2d 1556, 1560 (1984), "cooperation by the parties to the investigation is essential * * * to gather the data needed for an accurate determination."

The Commission's second reason—absence of opposition to the petition by the domestic producers—is a classical *fallicia consequentis*, a nonsequitur. The domestic producers, if injured by the imports, plainly had an incentive to cooperate with NKSA's petition and the Commission's data collection efforts, not to oppose it. Under such circumstances, the court is willing to read into the industry's silence, at best, passive acquiescence. Passive nonopposition to a dumping petition by the domestic industry, however, cannot be equated with actively supporting the investigation and submitting data sought by the Commission's questionnaires.

In *USX Corp. v. United States*, 11 CIT 82, 95, 655 F.Supp. 487, 498 (1987), this court commented: "Although ITC is not required to amass every conceivable shred of relevant data in order to comply with the requirements of the law, the absence of information necessary for a thorough analysis may render a determination unsupported by substantial evidence," *citing Kenda Rubber Industrial Co. v. United States*, 10 CIT 120, 630 F.Supp. 354, 358 n. 4 (1986). In sum, lack of expressions of opposition by the domestic producers is not a rational predicate for the Commission to conclude there was industry support. Conversely, lack of cooperation in responding to the questionnaires is a sound basis for drawing an adverse inference against the domestic industry.

Relying on 19 U.S.C. § 1677(4)(A), defining the term "industry" as "domestic producers *as a whole* of a like product, or those producers whose collective output of the like product constitutes a *major proportion of the total domestic production* of that product" (emphasis added), plaintiffs insist that the Commission's data base was not sufficiently *representative* of the industry under investigation producing the

like product—MMF sweaters (discussed *infra*)—but rather the data is reflective of merely the experience of a small and unrepresentative set of companies. The producer questionnaire data coverage for the U.S. MMF sweater industry was 15% for financial data and less than 7% for pricing.

In determining whether the Commission's questionnaire data base is sufficiently comprehensive to meet the substantial evidence standard in light of above-cited statutory definition of "industry," absolute or even majority coverage of the industry is not required. In utilizing questionnaires to obtain data in an industry comprised of more than 1,000 producers, where absolute coverage would be impractical given the time constraints for completing its investigations, the Commission had discretion to use representative sampling. The Commission's sampling methodology in sending out questionnaires has not been challenged in this case, but the sparse response data actually received and relied upon by the Commission is vigorously attacked by plaintiffs as unrepresentative of U.S. producers of MMF sweaters.

The problem here is that the Commission, having determined to rely on sampling to obtain representative questionnaire data, erred in making findings and conclusions as to many financial conditions and trends of the "industry" based merely on a small and random portion of the initial representative sampling of producers, and some producers submitted incomplete or partial responses. Such a data base had no pretense of being representative.

Even a low producer response rate from a sampling of producers does not require an adverse inference against the domestic industry where the Commission has reliable secondary sources for the necessary information. In the subject investigations, the Commission relied on a secondary source, publicly available Bureau of Census data for consumption, production, import levels and market share of imports. *ITC Report* at 28–29. Defendant maintains that despite the questionnaire response rate, an adverse inference was obviated by the fact the Commission—as in *Alberta Pork*—was

able to supplement its questionnaire responses by data from a secondary source.

However, defendant's reliance on *Alberta Pork* is misplaced. Unlike *Alberta Pork*, wherein the Commission had secondary information for all issues critical to its determination, in the subject investigations the Commission's assessment of numerous financial indicators of industry conditions and trends (*i.e.*, capacity utilization, quantities and value of goods shipped, end-of-period inventories, pricing, profitability, operating income and margins, productive capacity, and employment) was necessarily predicated on the producer questionnaire responses. Under these circumstances, representative coverage of the industry by the questionnaire data is obviously crucial to a determination supported by substantial evidence.

In addition to the problem of low producer response rate, plaintiffs urge that the questionnaire data was unrepresentative of the industry in that the administratively subpoenaed responses showed a substantially better operational and financial picture of the industry than did the voluntary or nonsubpoenaed responses. That is a matter of the credibility and weight to be accorded to the assertedly different categories of evidence in light of all the facts and circumstances, which must be judged by the trier of the fact. Similarly, it was within the Commission's discretion to judge as more credible and reliable a secondary source of production data, like the Census Bureau, than the questionnaire responses. The Commission's theory was that the questionnaire data was favorably skewed toward positive trends and upwardly biased against injury on a "survival of the fittest" theory (*viz.*, injured firms already forced out of business by dumped imports did not respond to questionnaires and hence only the financial conditions of the successful survivors are represented in the data base).

On remand, the Commission may conduct any further investigation deemed warranted to obtain data representative of the MMF sweater producers' pricing and the financial condition of the MMF sweater "industry," as defined in the statute; and/or,

the Commission may apply the adverse inference rule against the domestic industry.

### Petitioner's Interference with Investigations

■ In connection with these investigations, NKSA admittedly set up a task force, retained a consultant to assist member producers in responding to questionnaires, published articles in trade publications, made numerous telephone contacts with its members and others, sent out letters, and distributed a "Guide to Essential Questionnaire Items" ("Guide") to "assist" questionnaire respondents. The Guide, *inter alia*, advised the questionnaire recipients that NKSA expected the overall industry data would demonstrate that the producers were experiencing declining trends or other negative financial conditions pertinent to the particular question for response.

The gravamen of plaintiffs' charges of interference is that NKSA's acknowledged communications, independent investigation, and other activities seriously compromised the integrity and objectivity of the Commission's final determinations, particularly by the role of the Guide in "adulterating" the Commission's questionnaire response data base. Specifically, plaintiffs complain that the Guide, as well as other NKSA communications with its members, were leading and suggestive and improperly coached the producers to furnish the Commission biased data and selectively to withhold financial and pricing data from the Commission. Plaintiffs further claim they were aggrieved by the Commission's refusal to adequately investigate the charges of interference and by the Commission's refusal to draw an adverse inference against the domestic industry from NKSA's conduct.

NKSA's position with regard to its communications and other promotional activities related to furtherance of its petition is essentially that, as was its right and obligation as the petitioner in the investigations, NKSA simply acted in cooperation with, and indeed with the knowledge of, the Commission staff in obtaining an improved questionnaire response rate from its mem-

bers than that response rate experienced by the Commission in the preliminary investigations.

The court agrees with plaintiffs that if NKSA's sole objective in distributing its Guide was simply to urge producers to respond to questionnaires, it served no useful purpose for NKSA to tell the recipients that NKSA expected the response data would show declining or other negative industry conditions and trends. And, while it is true that in the Guide the individual recipients were not overtly told to give false or misleading data or withhold information, yet by telling the respondents what overall industry conditions and trends NKSA expected the data would show, NKSA tainted the Guide as simply a self-serving promotional device for NKSA's petition and *suggestive* of the specific data individual knitters would be required to furnish (or withhold) in their responses if they wished NKSA's petition to succeed.

The *ITC Report* addressed respondents' interference charges:

> The Korean and Taiwanese respondents argue that the petitioner interfered with the questionnaire process through contacts with members of the domestic industry. * * * Although the Commission is concerned with ensuring the objectivity of its investigations, we do not believe that this is a case in which that objectivity has been compromised. *The only contact on record that petitioner made with any producer was apparently with one of petitioner's own members, aimed primarily at exhorting that member to respond to the questionnaire and not at predetermining the type of response.*

*Id.* at 27 n. 77 (emphasis added).

As in the case of the Commission's discretion in applying the adverse inference rule on the basis of a sound rationale, *Alberta Pork*, similarly the Commission's decision as to whether the objectivity of its investigation has been compromised by interference in questionnaire responses must rest on a sound rationale. The Commission's summary dismissal of the respondents' interference charges with the refer-

ence in its report to a single innocuous communication with a producer is indeed remarkable. Even more remarkable is Commission counsel's contention that the manner in which the Commission conducts its investigations is judicially unreviewable.

There is much more at stake in plaintiffs' claims of interference than simply preserving the agency's role as the finder of fact and its discretion in evaluating, in light of petitioner's conduct, the weight and credibility of the evidence. Rather, plaintiffs' claims of petitioner interference implicate the very core of this court's responsibility on judicial review under 19 U.S.C. § 1516a(b)(1)(B) to address whether the Commission's findings, conclusions and determination are supported by substantial evidence.

Plaintiffs also vigorously protest the propriety of: NKSA's private questionnaire distributed to producers which exhorted the recipients to furnish NKSA information showing that U.S. knitting mills have been injured by imports of low-priced acrylic (and other manmade fiber) sweaters from Hong Kong, Korea, and Taiwan; a number of articles published in NKSA's trade publication *Knitting Times* explaining the nature of the antidumping investigations and the procedures being followed and pointing out the benefits to be obtained from affirmative determinations; and NKSA's advertisement in Yiddish for dissemination in the Williamsburgh, Brooklyn publication *Der Yid* in order to reach even the smallest Jewish knitting firms in that area.

The court sees no objectionable conduct in a trade association petitioner's communications, advertising activities, or other promotional efforts aimed in good faith simply to encourage interest by its members in an antidumping investigation and promote their cooperation with the association's and Commission's data requests. Clearly, the support of the domestic industry and the active cooperation with and assistance to the Commission of the parties to the investigation in the Commission's data collection efforts is imperative. *Atlantic Sugar*, 744 F.2d at 1560.

The court finds that much of NKSA's activities in these investigations were appropriate efforts to promote the interests and cooperation of the domestic producers, particularly in the face of the Commission's explicit warning in its preliminary report that it might reconsider an adverse inference against the domestic industry if the questionnaire response rate did not substantially improve in the final investigations.

However, NKSA's permissible role in communicating with its members in aid of the Commission's investigations and in promoting the success of its petition were not totally unbounded. In these investigations, NKSA's communication efforts, whether dubbed as "suggestion," "guidance" or "coaching," to bias the data provided by its members in questionnaire responses taints such data as "substantial evidence on the record." The required certification in questionnaire responses that the information supplied is "complete and correct" and the respondent's acknowledgment "that the information submitted is subject to audit and verification by the Commission" are not, as inferred by Defendant, a license for any communication a petitioner trade association wishes to make with a producer concerning a questionnaire response.

Commission counsel's argument that the Commission's decision on interference with the responses should be affirmed because the response data was more positive for plaintiffs than the more reliable Census production figures is *post hoc* rationalization and, in any event, substantively lacking in merit. Most of the critical financial data was derived from the responses, not the Census data.

In sum, it is the court's view that in these investigations NKSA exceeded permissible bounds of communication with its members in aid of the Commission's investigatory responsibilities. In view of NKSA's obviously pervasive and suggestive communications with the domestic industry and the Commission's erroneous finding of a single innocuous contact between NKSA and one of its members, a remand on the interference issue is plainly warranted. On remand, the Commission is directed to conduct a further investigation of NKSA's interference with the questionnaire responses, reevaluate whether "this is a case in which * * * objectivity [of the questionnaire response data] has been compromised," *ITC Report* at 27, n. 77, and reconsider whether to draw an adverse inference.

### Causation

■ Plaintiffs also find fault with the Commission's findings and conclusions regarding causation, *i.e.*, that the material injury found was by reason of the subject imports rather than due to a number of alternative explanations offered by respondents. *ITC Report* at 48–53. It is not necessary that the imports be the sole cause, or even the major cause, of injury as long as the evidence shows that the less than fair value imports are more than a *de minimis* factor in contributing to the injury. *See Maine Potato Council v. United States*, 9 CIT 293, 300–01, 613 F.Supp. 1237, 1244 (1985).

■ In making the causal connection of injury to the imports, the Commission pointed to "the massive volume of the subject imports," "their increasing market share," "the importance of price in the buying decisions of purchasers," as well as to the "underselling by subject imports." *ITC Report* at 52.

Regarding the price effects of the massive volume of sweater imports from Hong Kong, Taiwan, and Korea on the domestic producers, plaintiffs stress that the Commission merely *suggested the possibility* of price suppression. *See ITC Report* at 47–48. As this court recently stated, the "mere possibility" standard is not sufficient for a determination that must be based on substantial evidence. *China Nat'l Arts & Crafts Import & Export Corp. v. United States*, 15 CIT ——, ——, 771 F.Supp. 407, 412 (1991).

Further, regarding the price effects of the imports on the prices of domestic sweaters, plaintiffs maintain and the court agrees that the Commission erroneously relied on the "minuscule" U.S. pricing data

submitted by an extremely low and unrepresentative percentage portion of U.S. producers—covering less than 7 percent of U.S. production, and even included some jobber sales prices of U.S. products to retailers.

With respect to the hotly contested issue of underselling, although the Commission considered several other bases of price comparison and record information that the Commission believed were consistent with its finding of underselling, the Commission found that *the most appropriate price comparison for determining whether there was underselling* was "[a] comparison of retailers' direct import purchase prices reported in the importers['] questionnaires with the selling price reported by U.S. producers for their sales of sweaters to retailers * * *." *ITC Report* at 45. In that connection, the Commission observed:

> We find the evidence of underselling at the level of direct purchases of the subject imported sweaters by retailers to be important in the context of the manmade-fiber sweater market as a whole. Direct retail import purchases accounted for the majority of all sweater imports reported in questionnaire responses. A pattern of underselling at this principal level of trade indicates that the subject imports have adversely affected the sales and/or prices of U.S. producers.

*ITC Report* at 46–47 (footnotes omitted).

Using such price comparison methodology, relying heavily on direct purchases by the importer/retailers as the method of choice, the Commission found "that imports undersold comparable domestic sweaters in over 80 percent of the comparisons, by margins of over 50 percent in some cases." *Id.* at 45.

Plaintiffs maintain that the Commission's finding of underselling based on direct purchases by retailers was erroneously based on an improper comparison between the importers' f.o.b. foreign port import acquisition prices (exclusive of the 34.2 percent U.S. import duties, other costs and charges, and the importer's markup) and the domestic producers' prices. Hence, argues plaintiffs, the Commission compared prices at different levels of trade—an "apples to oranges" price comparison.

Defendant, on the other hand, advances the argument that the Commission collected and compared U.S. based prices for both the importer/retailers and domestic producers since it is evident from the Commission's questionnaire instructions that importers were to report prices on an f.o.b. U.S. port or equivalent basis. Defendant further argues that the Commission's finding of underselling based on the importer/retailer acquisition prices is buttressed by several other types of evidence (*i.e.*, importers' and producers' delivered prices, prices for U.S. sweaters reported in purchasers' questionnaires, and the testimony of a major U.S. buyer). Finally, Commission counsel baldly proffer the *post hoc* rationale that, in any event, the Commission's finding of causation was amply justified by other factors (*i.e.*, massive volume of imports, market penetration, etc.) independently of underselling. It clearly appears, however, from the Commission's report that underselling was judged to be a critical factor linking injury to the imports.

The court turns to the core of the dispute concerning underselling—the importer questionnaire instructions and the definitions therein of the pricing terms "Net f.o.b. prices" and "Net delivered prices."

Plaintiffs maintain that based on the pricing definitions, the questionnaire elicited and importers reported f.o.b. foreign port prices. Defendant, however, insists—based on these same definitions and other aspects of the questionnaire—that the responding firms would have understood that the prices elicited by the Commission were f.o.b. United States, not f.o.b. foreign port.

Specifically, defendant points to the juxtaposition of the definitions of "Net f.o.b. prices" and "Net delivered prices" in the instructions and contends that a side by side comparison of the two definitions makes clear that both price terms include all costs necessary to get the product to the United States, the only difference between the two pricing terms being that "net f.o.b. prices" exclude U.S. freight costs while "net delivered prices" include such U.S.

freight costs. Further, defendant asserts that the manner in which the Commission structured the "data pages"—the pages on which importers were to actually record their prices—informed the importers that the Commission was seeking United States based f.o.b. prices.

While Commission counsel's explanation of the interplay between the two pricing definitions clarifies what the Commission had in mind, unfortunately, the definitions standing alone in the instructions would simply not be clear to a typical importer regarding whether the f.o.b. prices to be reported refer to U.S. based or foreign port prices. The definitions would be particularly confusing where, as reported in these importer questionnaire responses, purchase prices were usually quoted on an "f.o.b. country-of-origin or point of consolidation basis." *See Final Staff Report* at A–65. The nub of the problem is that in formulating the pricing definitions, the Commission simply did not foresee the potential for confusion among importers as to the "net f.o.b. prices" to be reported.

It is critical to fair price comparisons that they be made at the level of actual competition in the U.S. market. *See Maine Potato Council,* 9 CIT at 301, 613 F.Supp. at 1245. Due to the flawed pricing definitions in the questionnaire instructions, as described above, the record is not clear concerning that matter. Additionally, the U.S. producer pricing data was inadequate for a thorough underselling analysis. Remand for further investigation and/or clarification of U.S. producer pricing and the importers' net f.o.b. purchase prices is warranted. *Cf. Maine Potato Council,* 9 CIT at 302, 613 F.Supp. at 1246.

*Like Product*

■ The statutory definition of the U.S. "industry," 19 U.S.C. § 1677(4)(A) under investigation for material injury is referenced to the producers of a "like product"; and the latter term is defined as "a product which is like, or in the absence of like, most similar in characteristics and uses with" the imported articles subject to investigation. 19 U.S.C. § 1677(10). Taiwan plain-

tiffs claim that for purposes of these investigations, the Commission should have found that the relevant "like product" was all sweaters regardless of fiber composition rather than only MMF sweaters.

The Commission's practice in identifying the "like product" for purposes of an injury investigation involves a multifaceted inquiry into a number of "like product" factors.

> No single factor is dispositive * * *. *The Commission has not drawn distinctions based on minor physical differences, and instead has looked for clear dividing lines between articles before considering them to be separate like products.*

*ITC Report* at 5 (footnotes omitted, emphasis added). No two like product investigations involve precisely the same methodological approach or the priority given by the Commission to like product factors. Clearly, such matters falls within the Commission's broad discretion and expertise in conducting investigations and may differ from case to case.

It is true, as stressed by defendant-intervenor, that the Commission's practice of "look[ing] for clear dividing lines between articles before considering them to be separate like products," *id.,* is not mandated either by the statute or judicial precedent. But, defendant-intervenor is incorrect in asserting that the Commission, having exercised its discretion to adopt that methodology, is not bound in judicial review by the standards and rationale utilized in its investigation. Fundamentally, an agency's decision must stand or fall on the rationale proffered by the agency itself, not *post hoc* rationale of counsel. *See Ashland Oil, Inc. v. Federal Trade Comm'n,* 548 F.2d 977, 981–82 (D.C.Cir.1976) (citing *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 169, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962)). Hence, the issue is whether there is substantial evidence supporting the Commission's like product determination. That standard reflects the Commission's established practice not to treat articles as separate "like products" when they cannot be clearly distinguished

from each other under the "like product" factors as a whole.

The Commission in some 22 pages of its 54 page report in these investigations addressed the "like product" factors it deemed relevant. As mentioned above, the Commission concluded: "the domestic product 'like' the subject imports is sweaters wholly or in chief weight of manmade fibers." *ITC Report* at 20. In that regard, the Commission summarized its comprehensive factual findings and extensive analysis:

We have gone into some detail on how natural-fiber and manmade-fiber sweaters compare in terms of the Commission's like product factors because of the complexity of the issue as well as the importance attached to it by the parties. If examined at a general level, several of the above like product factors show similarities between natural fiber sweaters and manmade-fiber sweaters. General physical appearance, end use, channels of distribution, and manufacturing process, are similar for all sweaters. Considered at a more specific level, significant differences emerge. This is particularly so with regard to manufacturing process and equipment, interchangeability, end use, customer perceptions, and price. *Also significant is the relatively minor position of blends.*

*Based on the discussion above, we find the specific differences to be more than "minor differences."* Fiber differences result in differences in production process, equipment, and cost, such that producers do not view the products as similar and *often manufacture sweaters of only one type of fiber.* The differences in physical characteristics have also meant that substitutability by consumers is limited to a significant degree for various reasons relating to end uses and other preferences.

*ITC Report* at 19–20 (footnotes omitted, emphasis added).

Taiwan plaintiffs, citing numerous agency precedents and long-standing practice, argue at great length (proceeding through all the like product factors addressed by the Commission in the subject investigations) that the Commission ignored its own clear dividing lines standard and that if the Commission had applied such standard, the Commission would have found that the relevant "like product" was all sweaters regardless of fiber composition.

Whether differences among products are minor or significant is a factual issue for the Commission to decide, and as in the case of all other factual findings, the Commission's finding in that regard must be supported by substantial evidence. *Torrington Co. v. United States,* 14 CIT ——, ——, 747 F.Supp. 744, 749 (1990), *aff'd,* 9 Fed.Cir. (T) ——, 938 F.2d 1278 (1991). Moreover, in reviewing the Commission's like product findings under the substantial evidence test, it is not the province of the courts to change the priority of the relevant like product factors or to reweigh or judge the credibility of conflicting evidence. "It is within the Commission's discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor or piece of evidence." *Maine Potato Council,* 9 CIT at 300, 613 F.Supp. at 1244. Further, because substantial evidence does not require the preponderance of the evidence, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. *Consolo v. Federal Maritime Comm'n,* 383 U.S. 607, 619–20, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966), *quoted in* Matsushita Elec. Indus. Co. v. United States, *3 Fed. Cir. (T) 44, 51, 750 F.2d 927, 933 (1984).*

Despite their strenuous disclaimer to the contrary, Taiwan plaintiffs ignore the above-cited authorities and in eighty-five pages of argument—amounting largely to a wholesale foray into each of the like product factors addressed by the Commission—urge that the court change the priority of the factors; reevaluate the significance and relevance of the similarities, distinctions, and overlaps in the like product factors; reweigh conflicting or inconsistent evidence on "key factual findings;" and generally substitute the court's judgment on factual matters committed to the Com-

mission's expertise and role as the finder of fact. In short, the Commission's like product analysis is supported by substantial evidence and is otherwise in accordance with law, except as pertains to the issue of blends.

The court must agree with Taiwan plaintiffs contention that the Commission's finding of a clear dividing line in the U.S. sweater industry based on fiber composition predicated on the minor position of blends in the market is unsupported by substantial evidence.

The Commission's finding of the minor position of blends was significant in the determination of the like product under the clear dividing line standard. Regarding the significance of blends, the Commission stated that "[t]he apparently small role played by sweaters of blends of different fibers increases the feasibility and appropriateness of drawing a clear dividing line on the basis of fiber." *ITC Report* at 18. *See also id.* at 20 n. 53 ("the relative insignificance of blends of different fibers make it possible to draw a dividing line according to fiber.")

Pertaining to the Commission's data on blends, a majority of the U.S. producers who responded to the questionnaires (28 out of 48) did not answer the questions; and of the 20 producers who responded, 10 indicated that they produced sweaters in multifiber blends. The court holds that the Commission's like product determination, insofar as it was based on a finding of the minor position of blends in the U.S. market, is unsupported by substantial evidence and is remanded for further investigation and/or reconsideration.

## CONCLUSION

For the reasons stated above, IT IS HEREBY ADJUDGED AND ORDERED:

1. On the present agency record, the Commission's final injury determinations are unsupported by substantial evidence and are otherwise not in accordance with law.

2. The Commission's determinations are remanded for further proceedings consistent with this opinion.

3. The Commission shall transmit its new determinations and report on remand to the Clerk of this court within 45 days after the entry of this Order. Plaintiffs, or any of them, shall have 10 days thereafter to respond to the Commission's report on remand; defendant and defendant-intervenor each shall have the option of replying to plaintiffs' submissions within 10 days thereafter.