ARAMIDE MAATSCHAPPIJ V.O.F. AND AKZO FIBERS INC., PLAINTIFFS *v.* UNITED STATES, DEFENDANT, AND E.I. DU PONT DE NEMOURS AND CO., INC., DEFENDANT-INTERVENOR

Court No. 94–07–00424S

(Dated June 19, 1995)

*Adduci, Mastriani, Schaumberg, Meeks & Schill, L.L.P. (Thomas M. Schaumberg, Barbara A. Murphy* and *Gregory C. Anthes)* for plaintiffs.

*Lyn M. Schlitt,* General Counsel, *James A. Toupin,* Deputy General Counsel, Office of the General Counsel, United States International Trade Commission *(Marc A. Bernstein)* for defendant.

*Wilmer, Cutler & Pickering (John D. Greenwald, Ronald I. Meltzer* and *Stuart M. Weiser)* for defendant-intervenor.

## OPINION

RESTANI, *Judge:* This matter is before the court on a motion for judgment upon the agency record pursuant to USCIT Rule 56.2. The motion has been brought by Aramid Products V.o.F. (formerly Aramide Maatschappij V.o.F.) and Akzo Nobel Fibers Inc. (formerly Akzo Fibers Inc.) (collectively "Akzo"), challenging the determination of the United States International Trade Commission (the "Commission") in *Aramid Fiber Formed of Poly Para-Phenylene Terephthalamide from the Netherlands,* USITC Pub. 2783, Inv. No. 731–TA–652 (June 1994) (affirmative final determ.) *("Final Det.").*

## BACKGROUND

On July 2, 1993, E.I. Du Pont de Nemours & Co., Inc. ("petitioner" or "Du Pont") filed a petition with the Commission and the International Trade Administration of the United States Department of Commerce ("Commerce"), alleging that an industry in the United States was materially injured or threatened with material injury by reason of less than fair value ("LTFV") imports of poly para-phenylene terephthalamide ("PPD-T aramid fiber") from the Netherlands. Du Pont is the sole U.S. producer of PPD-T aramid fiber, which is a high-performance synthetic fiber with special characteristics that include high strength, resistance to deformation from stretch, high thermal stability, fire resistance, and chemical resistance. PPD-T aramid fiber is available in a variety of forms, such as filament yarn, staple, pulp, floc, chopped fiber, and nonwovens.[1] It is distinguished from other types of fiber by its chemical composition, specific properties, method of production, and range of end uses. *Final Det.* at II–5. Commerce issued its final determination on

---

[1] Commerce determined that the product under investigation consisted of a "single class or kind of merchandise": PPD-T aramid in the form of filament yarn (including single and corded), staple fiber, pulp (wet or dry), spun-laced and spun-based nonwovens, chopped fiber and floc. Tire cord fabric is excluded from the class or kind of merchandise under investigation.

*Aramid Fiber Formed of Poly-Phenylene [sic] Terephthalamide from the Netherlands,* 59 Fed. Reg. 23,684, 23,685 (Dep't Comm. 1994) (final determ. of LTFV sales). Commerce further found three "such or similar" product categories: yarn, staple fiber and pulp. *Id.*

May 6, 1994, concluding that PPD-T aramid fiber imports from the Netherlands were being, or were likely to be, sold in the United States at LTFV. 59 Fed. Reg. at 23,684. Akzo was the only respondent involved in the investigation. In its final determination, the Commission concluded that the domestic PPD-T aramid fiber industry was materially injured by reason of the LTFV imports from the Netherlands.[2] *Aramid Fiber Formed of Poly Para-Phenylene Terephthalamide from the Netherlands,* 59 Fed. Reg. 32,220 (USITC 1994) (final). Akzo challenges the Commission's determination that the product under investigation consisted of a single like product, and that the subject imports were a cause of material injury to the domestic industry. Defendant and petitioner oppose Akzo's motion.

## STANDARD OF REVIEW

In reviewing final determinations in antidumping duty investigations, the court will hold unlawful those determinations of the Commission found to be unsupported by substantial evidence on the record, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B) (1988) (current version at 19 U.S.C.A. § 1516a(b)(1)(B)(i) (West Supp. 1995)).

## DISCUSSION

### I. *Like Product:*

The statute defines "like product" as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation." 19 U.S.C. § 1677(10) (1988). Factors that the Commission typically considers in defining "like product" include (1) physical characteristics and uses, (2) interchangeability of the products, (3) channels of distribution, (4) customer and producer perceptions of the products, (5) the use of common manufacturing facilities and personnel, and (6) price. *See Calabrian Corp. v. United States,* 16 CIT 342, 346 n.4, 794 F. Supp. 377, 382 n.4 (1992). The bases upon which a like product determination is made "fall[ ] within the Commission's broad discretion and expertise in conducting investigations." *Chung Ling Co. v. United States,* 16 CIT 636, 647, 805 F. Supp. 45, 54 (1992). Further, the Commission seeks clear dividing lines among possible like products and generally disregards minor variations. *Nippon Steel Corp. v. United States,* Slip Op. 95–57, at 11 (Apr. 3, 1995).

Akzo challenges the Commission's determination that PPD-T aramid fiber constituted a single like product, arguing that the Commission should have found four separate like products corresponding to four major forms of PPD-T aramid fiber—yarn, staple fiber, pulp and nonwovens. The court addresses Akzo's challenges according to the factors typically considered by the Commission in making its like product determination.

---

[2] Commissioner Bragg did not participate in the determination.

A. Physical characteristics and uses:

In its final determination, the Commission found that all forms of PPD-T aramid fiber have similar physical and structural characteristics, in that they are produced from the same raw materials and have the same chemical composition. *Final Det.* at I—6. Further, processing steps required to make the various downstream forms of PPD-T aramid fiber[3] do not alter the molecular organization of the material. *Id.* The Commission noted that physical differences exist among the various forms of PPD-T aramid fiber, thus many forms are "more appropriate for specific end-use applications." *Id.* The Commission further found that physical differences also exist within the four product groupings identified by Akzo. *Id.* Notwithstanding these differences, the Commission determined that

> it is significant that functions of PPD-T aramid fiber products frequently overlap among fiber forms and across applications. Information submitted by the parties indicates that PPD-T aramid fiber products in the forms of yarn, pulp, and staple are all used to deliver strength in their end-use applications. Products in the form of pulp, staple, and nonwovens are all used to impart thermal stability or insulation.

*Id.* Finally, the Commission concluded that generally common physical characteristics and product qualities distinguish aramid fibers from other fibers. *Id.* at I—8.

Akzo contends that the significant physical differences and specific end-use applications among the various forms do not support a single like product finding. Akzo also contests the Commission's conclusion that shared characteristics and functions distinguished PPD-T aramid fiber from other non-aramid fibers, on the basis that the Commission made no findings concerning the physical characteristics and product qualities of these other fibers. According to Akzo, evidence in the record of "inter-fiber" competition undermines the Commission's conclusion.

The shared physical characteristics and product qualities among the various PPD-T aramid fiber forms support the Commission's single like product finding. The Commission acknowledged the physical differences and specific end-use applications among the various PPD-T aramid forms, but found that these differences did not outweigh the products' shared functions and characteristics. Additionally, Akzo, in general, does not dispute that PPD-T aramid fiber has important shared characteristics and qualities.

Contrary to Akzo's second contention, the court finds that evidence in the record supports the Commission's conclusion that PPD-T aramid fiber is distinguished from other non-aramid fibers by its shared characteristics and qualities. Although Akzo correctly asserts that other fibers substitute for PPD-T aramid fiber in many applications, the record indi-

---

[3] Further processing steps are required to convert PPD-T aramid yarn into the various downstream product forms of staple, pulp and nonwovens. *Final Det.* at I—6.

cates that PPD-T aramid fiber dominates the market for high performance fibers (with the exception of carbon fibers). *See Final Det.* at II−9. Further, in most applications where PPD-T aramid fiber is used, "highly-specialized products * * * have been engineered around the characteristics of this fiber." *Id.* Also, in general, "when alternative materials are used [in place of PPD-T aramid fiber], the performance and the cost are lowered." *Id.* at II−30. Thus, the Commission adequately considered the role of other fibers.

B. Interchangeability of the products:

The Commission determined that there was limited interchangeability among the various forms of PPD-T aramid fiber, noting that the majority of purchasers of the subject merchandise indicated "they could not use more than one fiber type for their end-use applications." *Id.* at I−7. The Commission further found that these same purchasers indicated interchangeability was "also limited *within* the individual aramid fiber forms." *Id.* Despite the lack of interchangeability, the Commission concluded that the common characteristics of PPD-T aramid fiber warranted a single like product finding.

Akzo contends that the Commission's reliance on the lack of interchangeability *within* the various PPD-T aramid forms in support of its like product determination was erroneous and inconsistent with past Commission precedent. Akzo argues that the lack of interchangeability within each PPD-T aramid fiber form is irrelevant to a finding of separate like products. In support of its contention, Akzo cites *Certain Flat-Rolled Carbon Steel Prods. from Various Countries,* USITC Pub. 2664, Inv. Nos. 701−TA−319−332, 334, 336–342, 344, and 347–353, and Inv. Nos. 731−TA−573–579, 581–592, 594–597, 599–609, and 612–619, at 11–12 & n.13 (Aug. 1993) (final determs.), and *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof from Various Countries,* USITC Pub. 2185, Inv. Nos. 303−TA−19 and 20, and Inv. Nos. 731−TA−391–399, at 16–17, 33 (May 1989) (final), where the Commission found separate like products despite limited interchangeability within each like product grouping.

The court finds no error in the Commission's finding that limited interchangeability within the PPD-T aramid fiber forms supported its conclusion that no clear dividing lines existed among the various aramid products. The point is that the interchangeability test provides no clear-cut lines among products in such a situation. Further, contrary to Akzo's contention, the Commission did not rely solely on this finding to support its single like product determination. Rather, the Commission found that, *inter alia,* the common characteristics of the different ara-

mid forms supported single like product treatment, notwithstanding the limited interchangeability among forms or products within forms.[4]

C. Use of common manufacturing facilities and personnel:

In its final determination, the Commission found that the production process for aramid yarn was common to all forms of PPD-T aramid fiber, observing that additional production steps were applied to aramid yarn to produce staple, pulp and nonwovens. *Final Det.* at I–7; *see supra* note 3. The Commission noted that the additional processing needed for staple and pulp production was performed by Du Pont subcontractors in facilities separate from the one which Du Pont used to produce aramid yarn.[5] Nevertheless, the Commission found that yarn production workers constituted "a substantial majority of all PPD-T aramid fiber production workers in the United States." *Id.* Further, the Commission determined that yarn production made up a substantial majority of the total value of staple, pulp and nonwoven products.[6] *Id.* This is not an inconsequential factor.

Akzo does not challenge the factual findings made by the Commission, but asserts that even though staple, pulp and nonwovens share the yarn production process, this finding fails to support the conclusion of no clear dividing lines among the various PPD-T aramid product forms. According to Akzo, the additional production processes for the downstream products warrant a separate like product determination.[7]

The court does not find error in the Commission's consideration of the significant yarn production integral to the manufacture of the downstream aramid products. Although certain facilities and workers are dedicated to production of the downstream forms, with the exception of nonwovens, the value added by these additional production processes is small. *See Conf. Staff Rpt.* at I–27, fig. 2. Further, separate nonwoven production workers account for less than 1% of all domestic PPD-T aramid fiber production workers in 1993. *See id.,* App. D, at D–9. Thus, the

[4] In fact, at oral argument, petitioner indicated that for certain end-use applications, such as brakes and gaskets, there was interchangeability among the various aramid product forms during the "designing-in" phase. For example, a customer is able to choose between pulp or staple for the manufacture of brake and gasket products, even though as final end-use products, interchangeability is limited. *See Final Det.* at II–6; U.S. Int'l Trade Comm'n, *Aramid Fiber Formed of Poly Para-Phenylene Terephthalamide: Staff Report to the Commission,* List 2, Doc. 38, at I–70–I–71 ("*Conf. Staff Rpt.*").

[5] Akzo correctly contends that Du Pont manufactured nonwovens in facilities and with workers distinct from those used to manufacture aramid yarn. *See* Du Pont's Questionnaire Response, List 2, Doc. 40.10, at 35E. Yarn for nonwovens, however, was still produced at the same plant in which the remainder of aramid yarn was produced. *See Final Det.* at II–13 n.55; *Conf. Staff Rpt.* at I–24.

[6] Akzo contests the value-added figure for nonwoven production relied upon by the Commission, asserting that yarn production accounted for a lower percentage of the total value of nonwoven products. At oral argument, defendant explained that any discrepancy was due to use of average cost of production figures and adjustment for yield losses. *See Conf. Staff Rpt.* at I–27, fig. 2 & n.4. Both parties admit, however, that the percentage change is not significant.

[7] Akzo also asserts that the Commission's separate determinations for rayon filament yarn and rayon staple fiber, support its contention that separate like product determinations are warranted in this case. *See High-Tenacity Rayon Filament Yarn from Germany,* USITC Pub. 2525, Inv. No. 731–TA–530 (June 1992) (final); *Rayon Staple Fiber from France and from Finland,* USITC Pub. 938, Inv. Nos. AA1921–190 and AA1921–191 (Feb. 1979) (final). According to Akzo, the production processes involved here are used similarly to the manufacture rayon staple fiber from rayon yarn.

Contrary to Akzo's contention, however, the court does not find that the Commission's rayon fiber determinations establish that "yarn and staple fiber textile products are separate like products." Pls.' Mem. Supp. Mot. J. Upon Agency R. at 43. The rayon determinations involved one product form. Neither the "class or kind" scope determination by Commerce nor the arguments of the parties required the Commission to consider whether other product forms should have been included in the like product determinations for rayon yarn and rayon staple fiber. *See Rayon Filament Yarn,* USITC Pub. 2525, at 6; *Rayon Staple Fiber,* USITC Pub. 938, at 3.

Commission's consideration of the substantial yarn production processes involved in PPD-T aramid manufacture was reasonable.

D. Producer and customer perceptions of the products:

The Commission found that Du Pont maintained a single marketing operation for domestic sales of the various forms of PPD-T aramid fiber, and that the various products were marketed under a single proprietary name, Kevlar®. *Final Det.* at I–7. The Commission determined that these facts supported the conclusion that "the U.S. producer perceives aramid fiber to be a single like product." *Id.*

Akzo contends that the Commission's reliance on producer perceptions of the subject merchandise is unsupported by substantial evidence.[8] Specifically, Akzo argues that Du Pont's questionnaire response and annual reports support its contention that Du Pont markets nonwovens separately from other aramid fibers. Du Pont's questionnaire response bears out this conclusion, reflecting that Kevlar® nonwovens were marketed under a separate business unit. *See* Du Pont's Questionnaire Response, List 2, Doc. 40.10, at 35E. Du Pont's annual reports similarly refer to certain nonwoven products separately from the other Kevlar® aramid forms, although it is unclear whether Kevlar® nonwoven products are included in that reference. *See, e.g.,* Du Pont's 1993 Annual Rep., List 1, Doc. 110WW(2), at 11 (listing "Sontara, "Tyvek" and "Typar" nonwoven products). Du Pont admits that its Kevlar® nonwoven products were manufactured and marketed under a separate business unit, but argues that these operations come under an umbrella business unit that also markets the other Kevlar® aramid product forms.

In its final determination, the Commission did not address Du Pont's particular marketing scheme for its Kevlar® nonwovens. Instead, the Commission relied upon hearing testimony and a post-hearing affidavit in support of its conclusion that the various aramid fibers were marketed under a single marketing scheme.[9] *Final Det.* at I–7 n.21. Although the evidence in the record supporting these declarations is not particularly strong, it is clear that the nonwovens at issue are marketed under the name Kevlar®, even if a different business subunit is employed. It is within the Commission's discretion to weigh conflicting evidence, and the court finds the Commission's conclusion to be based on substantial evidence. *See, e.g., Chung Ling,* 16 CIT at 648, 805 F. Supp. at 55 ("[I]t is not the province of the courts to * * * reweigh or

---

[8] Akzo further asserts that the Commission's reliance on producer perceptions is not permitted under the statute. This argument is without merit. This court has repeatedly sanctioned the Commission's analysis of the various like product factors, including producer perceptions of the products at issue. *See, e.g., Calabrian Corp.,* 16 CIT at 346 n.4, 794 F. Supp. at 382 n.4. The court finds no conflict with the statute with regard to consideration of this factor. *See* 19 U.S.C. § 1677(10).

[9] An official at Du Pont testified that "[a]lthough [Kevlar®] is sold in different forms and into many different applications and markets, it is in fact one business." List 1, Doc. 109, at 25. Another official submitted a post-hearing affidavit, stating that "[a] single marketing and sales organization is responsible for the sales and market development activities for all four product forms." List 2, Doc. 28, Ex. I, Aff. 2, at 1. Contrary to Du Pont's suggestion, the post-hearing affidavit does not identify the umbrella business unit under which all Kevlar® products are marketed.

judge the credibility of conflicting evidence."); *Iwatsu Elec. Co. v. United States,* 15 CIT 44, 47, 758 F. Supp. 1506, 1509 (1991).[10]

The Commission also was not persuaded by Akzo's assertion that customers perceived the different forms of aramid fiber as different like products. The Commission stated that

> the customer declarations [Akzo] has submitted to support this contention are at best ambiguous. Some of the declarations refer to 'aramid fiber' as a type of product, and discuss the merits of 'aramid fiber' (as opposed to, for example, 'aramid yarn' or 'aramid staple') *vis à vis* other types of fibers.

*Final Det.* at I-7 n.27. Akzo contends that the Commission misconstrued the two customer affidavits Akzo submitted.

Contrary to Akzo's contention, however, it is not clear that in the first affidavit, the affiant's use of the term "aramid fiber" unambiguously refers to aramid yarn. *See* List 2, Doc. 11, at Ex. B. Similarly, in the second affidavit, the affiant, although previously mentioning specific aramid fiber products, used "aramid fiber" in a general context without reference to a specific type of aramid product. *See* List 2, Doc. 11, at Ex. E. The court finds no error in the Commission's conclusion that these affidavits were somewhat ambiguous as to the type of product being discussed.

E. Channels of distribution and price:

The Commission determined that all forms of PPD-T aramid fiber had the same channels of distribution, that is, each is sold directly from the manufacturer to the end-user. *Final Det.* at I-7. Akzo does not contest this finding.

The Commission also concluded that widely varying prices "rendered pricing data * * * unmeaningful for evaluating like product treatment for PPD-T aramid fiber." *Id.* at I-8 (footnote omitted). Akzo similarly does not challenge this finding. As price differences do not vary in any predictable way among the fiber forms, this factor supports a single like product finding.

In sum, the Commission determined that PPD-T aramid fiber constituted a single like product, on the basis of its analysis of the factors discussed above: generally common physical characteristics and product qualities, common channels of distribution and largely common production employees. The Commission further found that the differences among the various aramid fiber products did not outweigh "the common product characteristics shared by all forms." *Id.* Finally, although the evidence of producer perceptions of the subject merchandise as a single product is not particularly strong as it relates to nonwovens, the court

---

[10] In any event, remand would not be necessary on this issue in any case. Akzo did not produce or import PPD-T aramid nonwoven products during the period of investigation. Thus, a separate like product designation for nonwovens alone would not assist Akzo. Furthermore, a separate like product determination for nonwovens would have insignificant effect upon the Commission's material injury determination, as Du Pont shipments of nonwovens accounted for a very small percentage of Du Pont's total domestic PPD-T aramid fiber shipments. *Conf. Staff Rpt.* at I-36 tbl. 4; *id.*, App. D at D-9; Du Pont's Questionnaire Response, List 2, Doc. 40.10, at 35E.

does not find the Commission's determination on this issue to be unsupported by the record. Taken as a whole, the court finds the Commission's like product determination to be supported by substantial evidence in the record and in accordance with law.[11]

II. *Present Material Injury:*

In making its material injury determination, the Commission

(i) shall consider—

(I) the volume of imports of the merchandise * * *,

(II) the effect of imports of that merchandise on prices in the United States for like products, and

(III) the impact of imports of such merchandise on domestic producers of like products, but only in the context of production operations within the United States; and

(ii) may consider such other economic factors as are relevant to the determination regarding whether there is material injury by reason of imports.

19 U.S.C. § 1677(7)(B) (1988) (current version at 19 U.S.C.A. § 1677(7)(B) (West Supp. 1995)). "Material injury" is defined as "harm which is not inconsequential, immaterial, or unimportant." *Id.* § 1677(7)(A). In its final determination, the Commission concluded that PPD-T aramid fiber imports from the Netherlands were materially injuring the domestic PPD-T aramid fiber industry. *Final Det.* at I−16. Akzo maintains that the Commission's material injury determination is unsupported by substantial evidence.

A. Volume of LTFV imports:

The Commission determined that, despite a slight decline from 1992 to 1993, LTFV imports generally increased during the period of investigation by quantity and value. *Conf. Final Det.,* List 2, Doc. 39, at I−20 ("*Conf. Final Det.*"). As a percentage of total domestic consumption, however, the subject imports by quantity and value increased dramatically during the period. *Id.* at I−21; *see Conf. Staff Rep.* at C−3 tbl. C−1. The market share held by these imports rose from less than 5% in 1991 to more than 15% in 1993. *Conf. Final Det.* at I−21. On the basis of this data, the Commission determined that the volume of LTFV imports, relative to total domestic consumption, was significant. *Final Det.* at I−12.

Akzo contends that the volume of imports was not significant, asserting that quantitative import restrictions imposed by a cross-license agreement[12] entered into between Akzo and Du Pont limited the impact of imports. Specifically, Akzo asserts that its import volumes never exceeded the quantitative restrictions of the agreement for 1991, or, on

---

[11] The Commission alternatively determined that a "semifinished product" like product analysis supported the conclusion that a single like product existed for PPD-T aramid fiber. *Final Det.* at I−8 n.31. Commissioner Rohr applied this analysis. *Id.* As the court sustains the Commission's application of the traditional like product analysis, Akzo's challenge to the "semifinished product" like product analysis is not reached.

[12] Akzo and Du Pont entered into a cross-license agreement on May 10, 1988, to resolve long-standing legal disputes over PPD-T aramid fiber process patents. *Conf. Staff Rpt.* at I−5−I−6.

an annualized basis, for 1992.[13] Akzo's claim is without merit. First, Akzo's import volumes in 1992 and 1993, following the expiration of the cross-license agreement, significantly exceeded the quantitative restrictions imposed by the agreement. *See Conf. Final Rpt.* at I−6, I−58 tbl. 16. The court does not agree with Akzo's assertion that the cross-license agreement contemplated an extrapolated quantitative restriction for 1992. Further, the Commission considered the quantitative restrictions imposed by the agreement, but concluded that such "voluntary restraints on import volumes do not preclude a finding of material injury by reason of such imports." *See Final Det.* at I−12 n.70. The court finds the Commission's consideration of the significance of Akzo's imports to be reasonable.

B. Effects on prices:

The Commission determined that LTFV imports from the Netherlands suppressed domestic prices to a significant degree. *Id.* at I−14. In support of its conclusion, the Commission relied upon data indicating that there was underselling in 47 of 60 pricing comparisons of end-use purchases of the same products by the same purchasers, and that 11 of 12 purchasers of these products indicated that prices of the subject imports were generally lower than those for the domestic product. *Conf. Final Det.* at I−22-I−23. Additionally, the Commission noted that Akzo's pricing policy for certain customers was designed to undercut Du Pont sales, and that several purchasers specifically switched to Akzo's LTFV imports because of these lower prices. *See id.* at I−27 & n.89. The Commission further found price underselling to be significant in light of the high interchangeability among PPD-T aramid products that have qualified for specific end-use applications. *Final Det.* at I−13-I−14. Based upon these findings, the Commission found LTFV imports to significantly suppress domestic prices.

Akzo contends that the lack of cross-competition among the various PPD-T aramid products, and significant inter-fiber competition, fail to support the conclusion that imports significantly suppressed domestic prices. The Commission, however, recognized that "industrywide pricing data are of limited probative value." *Id.* at I−13 (footnote omitted). Thus, the Commission based its pricing comparisons upon prices charged by Du Pont and Akzo for the same products to the same purchaser. Although Akzo correctly states that interchangeability among the various forms of PPD-T aramid products was limited, the record indicates, and the Commission noted, that Du Pont and Akzo products that qualified for the same specific end-use application, were interchangeable. *Id.* at I−13, II−8, II−29. As this supports the probativeness of the selected pricing comparisons, the court finds no error in the Commission's analysis of the pricing data.

---

[13] The quantitative restriction imposed on Akzo's imports for 1992 was effective until expiration of Du Pont's last Kevlar® patent on March 4, 1992. *See* Pls.' Mem. Supp. Mot. J. Upon Agency R. at 52 n.7. In support of its argument, Akzo extrapolated this figure over the span of 1992 to arrive at an annualized quantitative restriction for imports.

Further, the Commission noted that inter-fiber competition was limited by the costs of switching from aramid fiber to another fiber, and the fact that aramid fiber largely deviated in price from substitute products. *Id.* at I – 14 n.84. In any case, the Commission observed that adverse price effects caused by substitute products were in addition to those caused by LTFV imports from Akzo. *Id.* The court finds no error in the Commission's conclusion. The evidence taken as a whole supports the Commission's determination that Akzo's LTFV imports were causing adverse price effects upon the domestic industry.

C. Impact of LTFV imports on the domestic industry:

The Commission determined that, on an industry-wide and market-segmented level,[14] there was significant evidence of lost sales. *Final Det.* at I – 14. As a result, the Commission concluded that declining sales and market shares, reduced employment levels, and the impaired financial condition of the domestic industry were caused by LTFV imports from the Netherlands. *Id.* at I – 15. Additionally, the Commission found that the subject imports had actual and potential negative effects on the domestic industry's existing development and production efforts. *Id.* Based upon these findings, the Commission concluded that LTFV imports were having a negative impact on the domestic industry.

The Commission dismissed Akzo's contention that inter-fiber competition was the primary cause of injury to the domestic industry. Akzo failed to document any instances where "it sold aramid fiber to customers who had previously switched [from Du Pont fibers] to other fibers." *Id.* at I – 15. The record also indicates that, while domestic shipments declined, LTFV imports increased significantly in several end-use markets where overall shipments increased, thereby displacing domestic products. *Conf. Final Det.* at I – 26. The displacement conclusion is further supported by purchaser questionnaire responses stating that several purchasers specifically switched to the LTFV imports because of lower prices, as compared to the domestic product. *Final Det.* at I – 15; *see Conf. Staff Rpt.* at I – 93, I – 95 – I – 98, I – 101, I – 104 – I – 105.

The court notes that this is the rare case where anecdotal lost sales data was probative, and because of Du Pont's position as the single U.S. producer and Akzo's position as the only foreign producer, together with Akzo's pricing policies, the nexus between imports and injury is particularly clear. Accordingly, the court sustains the Commission's determination that the domestic PPD-T aramid fiber industry was materially injured by reason of the LTFV imports from the Netherlands.

---

[14] Akzo alleges that, based on the limited interchangeability among the PPD-T aramid product forms, the Commission should have conducted its entire material injury analysis on the basis of market segments, rather than relying upon certain market segment data that supported its injury determination. *See Conf. Final Det.* at I – 26-I – 27. The court disagrees. The selection of pricing data for analysis appears to have been made upon a reasonable basis. Furthermore, the Commission is not required as a general matter to conduct a market-segmented material injury analysis. *See Encon Indus., Inc. v. United States,* 16 CIT 840, 842 (1992); *see also Copperweld Corp. v. United States,* 12 CIT 148, 162, 682 F. Supp. 552, 566 (1988) ("[N]either the governing statute nor its legislative history require the ITC to adopt any particular analysis when the market consists of several segments."). Rather, the facts of a particular case will determine a range of acceptable methodologies. The methodologies employed here are within that range.

CONCLUSION

In conclusion, the court finds the Commission's single like product determination to be supported by substantial evidence. Further, Akzo has failed to demonstrate error as to the Commission's material injury determination. Thus, the Commission's affirmative material injury determination for the Netherlands is found to be supported by substantial evidence, is in accordance with law, and is sustained.