The MAINE POTATO COUNCIL, Plaintiff,

v.

The UNITED STATES, Defendant.

Court No. 84-1-00141.

United States Court of International Trade.

June 27, 1985.

Heron, Burchette, Ruckert & Rothwell, Washington, D.C. (Thomas A. Rothwell, Jr., James M. Lyons and Alfred G. Scholle) Washington, D.C., for plaintiff.

Lyn M. Schlitt, Gen. Counsel, Michael P. Mabile, Asst. Gen. Counsel, U.S. Intern. Trade Com'n, Washington, D.C., Stephen A. McLaughlin, Washington, D.C., for defendant.

### OPINION AND ORDER

RESTANI, Judge.

Plaintiff, the Maine Potato Council, challenges a final determination of the United States International Trade Commission (ITC or Commission) regarding its investigation of fall-harvested round white potatoes from Canada. The Commission, on December 19, 1983, pursuant to § 735(b)(1) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1673d(b)(1) (1982), found that the domestic industry was not suffering from, or threatened with, material injury by reason of imports of fall-harvested round white potatoes from Canada sold at less than fair value (LTFV). *Fall-Harvested Round White Potatoes from Canada*, Inv. No. 731–TA–124 (Final), USITC Pub. No. 1463 (December 1983); 48 Fed.Reg. 57,381 (December 29, 1983). This negative injury determination followed affirmative findings by the International Trade Administration of the Department of Commerce (ITA) that fall-harvested round white potatoes from Canada were being sold in this country at LTFV. 48 Fed.Reg. 51,669 (November 10, 1983).

Jurisdiction in this action is predicated upon 28 U.S.C. § 1581(c) (1982). This matter is before the court, pursuant to Court of International Trade Rule 56.1, on plaintiff's motion for review of administrative determinations upon the agency record.

For the reasons that follow, the court concludes that some of the ITC's findings are supported by substantial evidence in the administrative record and other findings are remanded for further consideration not inconsistent with this opinion.

## I. ITC Findings Regarding the Domestic Fall-Harvested Round White Potato Industry

In a final antidumping investigation, the ITC is required to determine whether:

(A) an industry in the United States—

(i) is materially injured, or

(ii) is threatened with material injury, or

(B) the establishment of an industry in the United States is materially retarded,

*by reason of imports* of the merchandise with respect to which the administering authority [ITA] has made an affirmative determination under subsection (a)(1) of this section.

19 U.S.C. § 1673d(b)(1) (1982) (emphasis added). Thus, without both a finding of material injury, or threat thereof, and a finding that such injury was by reason of the subject imports, antidumping relief may not be granted.

The Commission unanimously found that the industry in the United States was not materially injured or threatened with material injury by reason of imports of fall-harvested round white potatoes from Canada

at LTFV.[1] *Fall-Harvested Round White Potatoes from Canada,* Inv. No. 731–TA–124 (Final), USITC Pub. No. 1463 at 3 (December 1983) (ITC Opinion). The Commission found that the regional domestic industry was "experiencing material injury, reflected primarily by irregular declines in acreage harvested, a decline in part-time employment, financial losses and difficulty in obtaining financial assistance." ITC Opinion at 3. The Commission explained its conclusion that the Canadian LTFV imports were not a cause of the industry's problems:

> An analysis of the price and volume effects of the Canadian imports on the domestic industry indicates that changes in regional domestic production, rather than imports, determine prices of fall-harvested round white potatoes in the U.S. market. A causal link between the imports and the domestic industry's injury is absent since most losses to the industry occurred when imports were lowest and domestic production was highest. Moreover, once in the U.S. market, the volume effect of Canadian potatoes on price was insignificant or non-existent; the increase in domestic production from 1980/81 to 1982/83 was the predominant factor affecting price.

> Pricing data further demonstrate that both import and domestic prices rose and fell together, apparently in response to the same changes in domestic production; that prices in the Northeast market were highly correlated with prices in other sections of the country where imports were absent or less concentrated; and that Canadian potatoes did not undersell the domestic product. Also, other factors such as tighter size standards, a perceived higher quality of the Canadian

potato and more effective marketing organization among many Canadian growers were found to contribute to the competitiveness of the Canadian product.

> No threat of injury was found to exist to the industry, since import penetration has fallen, Canadian inventories are down, and production of round whites in Eastern Canada is not expected to increase.

ITC Opinion at 4.

## II. Evidence in the Record Regarding Material Injury by Reason of LTFV Imports

"Material injury" is defined as "harm which is not inconsequential, immaterial, or unimportant." 19 U.S.C. § 1677(7)(A) (1982). The Commission found in this case that data for the domestic industry on regional acreage, employment, and financial condition indicated that potato growers in the Northeastern region have experienced material injury. Specific findings include the following: (1) acreage harvested fell 14.8% during the 5-year period investigated; (2) full and part-time employment fell over 15.0% from 1980/81 to 1982/83; and (3) hours worked by persons engaged in potato operations declined 7.0% from 1980/81 to 1982/83. Available financial data indicated losses to the industry, particularly in 1980 and 1982.[2]

As indicated previously, the Commission, however, concluded that such injury was not caused or predominantly caused by the LTFV imports. The Commission found that LTFV imports had no measurable effect on domestic prices in the regional market. The Commission noted that when domestic production increased, the average price for Maine potatoes decreased, and

---

1. Plaintiff does not appear to challenge specifically the Commission's finding with regard to threat of material injury.

2. Additional evidence of the Maine growers' financial difficulties was found in data provided by the Farmers Home Administration (FmHA), which finances over 50% of Maine's potato growers. The number of potato farms financed declined from 518 in 1979 to 428 in 1983, or by

17%, and the number of potato acres financed declined from 44,627 in 1979 to 35,249 in 1983, or by 21%. In 1983 alone, the FmHA dropped 88 potato farmers. Also in 1983, the FmHA financed 47 new farmers, most of whom were no longer able to secure financing from production credit associations or private banks. The percentage of loans collected by the FmHA declined substantially between 1980 and 1982.

vice versa.[3] The data showed that imports into the United States market increased when prices in this market were highest, and that losses to the domestic industry were greatest when regional domestic production was high and imports were relatively low.

The Commission also indicated that the volume effect of the LTFV imports on United States prices was insignificant. The Commission noted that in 1980/81 the average wholesale price of round white potatoes in the New York City terminal market increased even though LTFV Canadian imports increased.[4] In comparison, the price fell between 1981/82 and 1982/83, even though imports into the region fell. In general, price data for domestic and imported potatoes rose and fell together.

Moreover, the Commission found that potato prices in the regional market were highly correlated with prices in United States cities where Canadian imports were absent or less concentrated. The Commission concluded that this suggests that the domestic potato prices were responding to changes in regional domestic production rather than the price of imports.

Price data also demonstrated that Canadian imports generally sold for higher prices than Maine potatoes. Every month from September 1979 to October 1983, Canadian imports sold in the New York City terminal market were higher priced than Maine round white potatoes. Similarly, Boston's prices for the Canadian imports during all but two of these months were higher than for the domestic items. In Philadelphia, three of the four months examined in 1983 also showed Canadian imports selling at higher prices than Maine potatoes. Other data revealed that prices of New Brunswick potatoes tended to be higher than prices of Maine potatoes in January 1983 and that prices for Prince Edward Island potatoes tended to be substantially higher than Maine prices for the same period.

While the Commission stated that fall-harvested round white potatoes from New Brunswick, Canada, and Maine were generally considered equal in quality,[5] nonprice factors were found to contribute to the competitiveness of the Canadian potatoes. Prince Edward Island potatoes are considered more appealing in appearance because they are grown in a reddish soil, and both Prince Edward Island and New Brunswick potatoes are preferred due to more uniform Canadian size requirements.[6] Differences in Canadian and U.S. marketing also contributed to the competitiveness of Canadian potatoes.

### III. Legality of the Commission's Findings

#### A. Consideration of LTFV Margins.

 Plaintiff challenges the ITC's negative injury determination on several grounds. First, plaintiff complains that the Commission's causation analysis is flawed because the Commission failed to consider the effect of the dumping margins on the domestic industry. Plaintiff asserts that in certain cases the Commission is required to address explicitly the impact of the dumping margin on the domestic industry, and that the instant case falls in that

---

3. In 1980/81, average prices for Maine potatoes (Maine prices) were $6.52 in New York City and $5.85 in Boston. In 1981/82, regional production increased 6.4% and average Maine prices fell to $4.33 in New York City and to $3.86 in Boston. In 1982/83, regional production increased 6.2%, and average Maine prices declined to $3.77 in New York City and to $3.38 in Boston. In 1983, regional production declined 18.8% and average Maine prices rose to $5.50 in New York and to $4.85 in Boston.

4. The Commission observed that imports increased from 787,000 hundredweight (cwt.) in 1979/80 to 1.8 million cwt. in 1980/81. Imports increased slightly in 1981/82 to 2.1 million cwt., declining in 1982/83 to 1.3 million cwt. The ratio of imports to apparent consumption in the regional market increased from 2.5% in 1979/80 to 6.4% in 1980/81 and to 6.7% in 1981/82. Import penetration then decreased to 4.0% in 1982/83.

5. Presumably taste was the main factor in this quality determination.

6. The court will refer to these particular nonprice factors as quality factors in subsequent discussions.

category. Plaintiff, however, fails to offer convincing support for its proposition that the ITC must perform a margins analysis. Plaintiff's only authority is *Carbon Steel Wire Rod from Brazil, Belgium, France, and Venezuela*, Inv. Nos. 701–TA–148, 149, 150 and 731–TA–88 (Preliminary), 47 Fed.Reg. 13,927 (April 1, 1982). In that case, Commissioner Paula Stern argued that the Commission could make a negative final determination if "dumping has accounted for only a small portion of the margin of underselling...." 47 Fed.Reg. at 13,933. Plaintiff offers no authority in which the Commission has ever considered the margin of dumping in reaching an affirmative final determination. Chairman Alfred E. Eckes in *Certain Welded Carbon Steel Pipes and Tubes from the Republic of Korea and Taiwan*, Inv. Nos. 731–TA–131, 132 and 138 (Final), USITC Pub. No. 1519 at 11 n. 46 (1984), stated that:

> [D]espite an ambiguous reference to margins in a Committee report, the law makes no reference to Commission consideration of LTFV margins, nor does it suggest that the size of such margins is dispositive of the causation issue.

The Commission further stated:

> [T]he fact that the LTFV margins are more likely to be manifested in low prices in the U.S. market, in comparison to the amount of the subsidy, does not aid in interpreting the causality requirement of the statute. As currently written, there is no suggestion in the statutory definition of material injury, which applies both to countervailing and antidumping duty determinations, that the Commission should base its injury finding on the price effect of the subsidy or the LTFV margins. *See* 19 U.S.C. § 1677(7).

USITC Pub. No. 1519 at 11 n. 47. Thus, it appears that the Commission's interpretation of the statute does not require consideration of LTFV margins. An agency's interpretation of a statute it is charged with administering is entitled to great weight. *Melamine Chemicals, Inc. v. United States*, 732 F.2d 924, 928 (Fed.Cir. 1984) (*citing Zenith Radio Corp. v. United States*, 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978)).

Moreover, a recent Congress spoke on this issue. An early draft of the Trade and Tariff Act of 1984 contained a provision which would have given the Commission the authority to base decisions on the size of the dumping or subsidy margin found by the ITA. The House Ways and Means Committee voted to delete this provision. Language in a corresponding provision dealing with interlocutory appeals to this court, however, temporarily—and erroneously—survived. The following colloquy on the floor of the House explains:

> Mr. JENKINS. Mr. Chairman, I would like to engage the chairman of the Trade Subcommittee in a brief colloquy. I understand that section 110 of the bill[,] which deals with interlocutory appeals[,] may still contain language which refers to determinations by the Commission based on the size of the dumping margin or net subsidy. In the Ways and Means Committee we voted to delete a provision which would have given the Commission authority to base its decision on the dumping margin or subsidy level. Therefore, I would assume that this language in section 110 should have been deleted. Can the gentleman assure me that this language does not authorize such determinations by the Commission and that at some future point the necessary conforming changes will be made?
>
> Mr. GIBBONS. Mr. Chairman, will the gentleman yield.[?]
>
> Mr. JENKINS. I yield to the chairman of the subcommittee.
>
> Mr. GIBBONS. The gentleman is correct. Regrettably, we should have deleted this reference in section 110. Let me assure you that this language deals only with the time periods for filing appeals with the Court of International Trade and in no way does it confer authority on the Commission to base determinations on the subsidy level or dumping margin. I also want to assure you we will work with the Senate to modify the language

and correct the problem, but since it is a very minor technical change, I do not see any need for us to deal with it at this time.

96 Cong.Rec. H7908–09 (daily ed. July 26, 1984).

■ The legislative history of the 1984 Act supports the court's conclusion that the Commission is not required to consider dumping margins in reaching a decision on material injury by reason of LTFV imports. Although the court should not place too high a value on the views of one Congress as to the construction of a statute enacted by another Congress, *United States v. Southwestern Cable Co.*, 392 U.S. 157, 170, 88 S.Ct. 1994, 2001, 20 L.Ed.2d 1001 (1968), the views of a subsequent Congress may be given some consideration in interpreting relevant Congressional intent. *Seymour v. Superintendent of Washington State Penitentiary*, 368 U.S. 351, 356–57, 82 S.Ct. 424, 427, 7 L.Ed.2d 346 (1962); *see Heckler v. Turner*, —— U.S. ——, ——, 105 S.Ct. 1138, 1152–53, 84 L.Ed.2d 138 (1985); *Mattz v. Arnett*, 412 U.S. 481, 505, 93 S.Ct. 2245, 2258, 37 L.Ed.2d 92 (1973). This is particularly true where the enacting Congress was silent and where the views found in the legislative history are in accord with the statutory language.

B. *LTFV Imports as a Contributing Cause of Material Injury.*

■ Second, plaintiff complains that the Commission's causation analysis is flawed because the Commission stated that LTFV imports were not a "material cause" of the domestic industry's injury. ITC Opinion at 3. The use of the term "material cause," plaintiff argues, demonstrates that the ITC employed the wrong causation standard. Plaintiff correctly asserts that it is not necessary for plaintiff to show that the imports are the sole cause, nor even the major cause of injury, as long as the facts show that LTFV imports are more than a *de minimis* factor in contributing to the injury. *See British Steel Corp. v. United States*, 8 CIT ——, 593 F.Supp. 405, 413 (1984); *Pig Iron from Canada, Finland*

*and West Germany*, Inv. Nos. AA 1921–72, 73, 74, T.C. Pub. No. 398 at 6 (1971); *Elemental Sulphur From Mexico*, Inv. No. AA 1921–92, T.C. Pub. No. 484 at 3 (1972). Plaintiff argues that the Commission failed to consider whether LTFV imports were a "contributing" cause, and that instead the Commission required evidence that the LTFV imports were a "material cause." Plaintiff also argues that because the ITC determined that the LTFV imports were not a "material cause" of the domestic industry's injury, it inferred that LTFV imports were a "contributing cause" of injury. Although the court will not rely solely on what might be a simple mistake in word usage, the court is concerned as to whether the Commission actually weighed causes and improperly discounted a contributing cause of injury.

In this regard, plaintiff contends that there is substantial evidence in the record to support a finding that imports were indeed a contributing cause of injury and that the ITC, therefore, must have improperly weighed causes. Plaintiff specifically argues that an econometric study prepared by the Commission's staff establishes that the volume of LTFV imports found here would significantly reduce domestic prices, and that this study so detracts from the evidence supporting a negative injury determination as to eradicate it, or at least to render it insubstantial. In effect, plaintiff argues that the ITC's determination is unsupported by substantial evidence in the record.

■ In reviewing the Commission's determination, this court must sustain "a final negative injury determination by the ITC ... unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.' 19 U.S.C. § 1516a(b)(1)(B) (1982)." *American Spring Wire Corp. v. United States*, 6 CIT ——, 590 F.Supp. 1273, 1276 (1984), *aff'd sub nom. Armco, Inc. v. United States*, 760 F.2d 249 (Fed.Cir.1985). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to sup-

port a conclusion." *Matsushita Electric Industrial Co. v. United States,* 750 F.2d 927, 933 (Fed.Cir.1984) (*quoting Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951), and *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)); and *quoted in American Spring Wire Corp.,* 590 F.Supp. at 1276. "The court may not substitute its judgment for that of the [agency] when the choice is 'between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo....*' " *American Spring Wire Corp.,* 590 F.Supp. at 1276 (*quoting Penntech Papers, Inc. v. NLRB,* 706 F.2d 18, 22–23 (1st Cir.1983), *cert. denied,* — U.S. ——, 104 S.Ct. 237, 78 L.Ed.2d 228 (1983) (*quoting Universal Camera Corp.,* 340 U.S. at 488, 71 S.Ct. at 464)). *See also Sprague Electric Co. v. United States,* 2 CIT 302, 310–11, 529 F.Supp. 676, 682–83 (1981). It is within the Commission's discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor or piece of evidence. *See* S.Rep. 249, 96th Cong., 1st Sess. at 74–75 (1979), U.S.Code Cong. & Admin.News 1979, 381.

■ In this case, the Commission states that import volume effects on price were insignificant. The court understands this to mean that price levels were controlled by domestic factors, but the Commission also states that price was *predominantly* controlled by domestic production. In foot-

note 46 of its opinion the Commission cites the econometric study mentioned above in support of this proposition.[7] It is one thing to say domestic factors caused the injury and quite another to say that such factors were the dominant ones in the causation of injury. In its opinion the Commission appears to say both. The court is left with the impossible task of deciding which of two conclusions was reached by the Commission.[8] As indicated, it is not for the court to say in the first instance, which conclusion is best supported by the evidence. This is a determination which must be made by the Commission.[9] If the Commission concludes that LTFV imports were anything but a *de minimis* cause of injury, it must make an affirmative injury finding. *See British Steel Corp.,* 593 F.Supp. at 413.

### C. *Underselling: Levels of Comparison.*

■ Third, plaintiff challenges the methods used by the ITC in reaching its decision that there was no price undercutting. Plaintiff argues that the Commission's decision is flawed because it did not compare prices at an "optimum level." That is, plaintiff argues that it was incumbent on the ITC to compare prices at levels closer to the potato growers before the Commission could properly conclude that the imports did not undersell the domestic product.

The record, however, shows that the Commission made its finding of no underselling by examining data from several

---

**7.** Plaintiff argues that because the ITC found lesser degrees of import penetration significant in other cases, it should do so here. *See Certain Carbon Steel Products from Spain,* Inv. Nos. 701–TA–155, 157, 158, 159, 160, and 162 (Final), 48 Fed.Reg. 525 (January 5, 1983); *Carbon Steel Wire Rod from Brazil and Trinidad and Tobago,* Inv. Nos. 731–TA–113 and 114 (Final), USITC Pub. No. 1444 (October 1983). The problem with plaintiff's position is that the Commission must make its determinations on a case-by-case basis. H.R.Rep. 317, 96th Cong., 1st Sess. at 46 (1979); S.Rep. 249, 96th Cong., 1st Sess. at 88 (1979). The volume of potato production varies dramatically and is reflective of an industry very different from non-agricultural industries.

While factual similarities with regard to dissimilar industries may be probative evidence, they do not require similar conclusions.

**8.** The court does not accept plaintiff's argument that the econometric study mandates an affirmative injury determination. Such a theoretical model, based on a set of assumptions, may be outweighed by real world data.

**9.** The court is not seeking the use of some magic words. Because of factors to be discussed in section "D", *infra,* there is considerable doubt in the court's mind as to what the Commission will conclude on remand.

sources. The ITC sent out questionnaires regarding actual price, but failed to receive adequate data in response to make a determination as to underselling based on this data alone. The Commission then proceeded to examine Customs invoices for price data, as well as to obtain information on relative prices and wholesale prices—all of which supported the ITC's conclusion that Canadian imports generally did not undersell domestic potatoes. Thus, the Commission properly used the best available information.

■■■■ Plaintiff also argues that before comparing Canadian prices to domestic prices, the ITC should have subtracted the additional transportation costs and duties from Canadian prices. When comparing the price of United States goods with the price of imports, the Commission must compare prices at the level of actual competition in the United States market. *British Steel Corp.*, 593 F.Supp. at 412. Actual market price would include transportation costs for Canadian and Maine potatoes, as well as the ordinary duty for Canadian potatoes.[10]

### D. *Quality Differences.*

■■■■■ A final basis for attacking the Commission's decision, plaintiff argues, is that the Commission, after finding that the perceived higher quality of the Canadian imports contributed to the effectiveness of the Canadian product, did not properly consider quality differences when evaluating lost sales data, price suppression, and underselling. The Commission is not required to make a perfect statement as to the reasons for its determination. Absent some showing to the contrary, the Commission is presumed to have considered all evidence in the record. *Rhone Poulenc v. United States*, 8 CIT ——, 592 F.Supp. 1318, 1326 (1984). If the Commission's

opinion, when read as a whole, is supported by substantial evidence, it must stand. *See Sprague Electric Co.*, 2 CIT at 310, 529 F.Supp. at 682. Here, however, the Commission found quality to be a factor contributing to the competitiveness of the Canadian imports. Thus, quality was found to be a significant factor. Nonetheless, it is not clear from the Commission's opinion how the Commission treated the issue of quality differences when evaluating price suppression, price comparisons, and lost sales and whether that treatment was proper.

Defendant's counsel conceded at oral argument the possibility that the Canadian imports, notwithstanding their higher price, could theoretically have had a price suppressing effect on domestic prices due to the perceived higher quality of the imports, but counsel argued this factor was properly considered and accounted for. In addition, perceived quality differences were said to have been considered in the Commission's price comparisons in its inquiry into underselling. Counsel's *post hoc* rationalization cannot substitute for a clear statement by the Commission as to how it treated quality differences.

Plaintiff also argues that the Commission improperly disregarded lost sales due to quality factors.[11] There is no statutory provision which requires the Commission to perform a particular type of analysis in order to draw a conclusion regarding lost sales per se. Although the Commission must assess the impact of imports on the domestic industry, the Commission may make such an evaluation on whatever rational basis it chooses. Here the Commission used lost sales to determine if sales were lost due to price factors, an important test of injury.[12] What is of concern in regards to the lost sales analysis is what

---

**10.** Of course, proper adjustment must be made for the effects of these proceedings, if any such effects exist.

**11.** Out of nineteen allegations of lost sales investigated by the Commission, "almost none" were due to a lower Canadian price. A number of

buyers, however, stated that they purchased Canadian potatoes because of higher quality.

**12.** Certain affidavits indicated that sales were lost because of price. The ITC could not confirm the statements in the affidavits and exercised its discretion in disregarding them.

the Commission did after it concluded that sales were being lost because of quality factors, and that quality factors were important to the competitiveness of Canadian potatoes.[13] At that point the Commission was compelled to treat this factor, particularly in regards to its analysis of price suppression. With regard to underselling, it is not clear that a consistently significant quality difference should not or could not be quantified.

Since the Commission's findings on price suppression and underselling appear crucial to its decision, the Commission must clarify the basis for such findings. *See SCM Corp. v. United States,* 84 Cust.Ct. 227, C.R.D. 80–2 (1980), *aff'd,* 2 CIT 1, 519 F.Supp. 911 (1981), *reaff'd,* 4 CIT 7, 544 F.Supp. 194 (1982).

Accordingly, the ITC is instructed to explain how it treated the issue of quality differences when finding no price suppression by reason of LTFV imports and no underselling and how such findings led to the final decision regarding injury. If the Commission did not consider quality differences previously, it should do so now. In addition, the Commission shall state whether it finds overall that imports were a contributing cause of injury and how that finding relates to data on volume effects. The Commission's opinion on remand will be delivered to this court and plaintiff no later than July 25, 1985. Plaintiff may respond by delivering papers to this court and to defendant no later than August 5, 1985. Defendant may reply by delivering its papers to this court and to plaintiff no later than August 15, 1985.

---

**13.** This case is factually distinguishable from *Jeanette Sheet Glass Corp. v. United States,* 9 CIT ——, 607 F.Supp. 123 (1985), *appeal docketed* No. 85–2455 (Fed.Cir. May 24, 1985), wherein quality was not found to be a consistently significant factor.