COMPANHIA PAULISTA DE FERRO-LIGAS AND SIBRA ELETRO SIDERURGICA BRASILEIRA S/A, PLAINTIFFS *v.* UNITED STATES, DEFENDANT, AND ELKEM METALS CO., DEFENDANT-INTERVENOR

Court No. 95–01–00068

(Dated April 15, 1996)

*Willkie Farr & Gallagher (Christopher S. Stokes* and *Edgar B. Miller)* replacing *Dorsey & Whitney L.L.P. (Munford Page Hall, II, Philippe M. Bruno, Linda P. Reppert,* and *Karen A. Zughaib)* for plaintiffs.

*Lyn M. Schlitt,* General Counsel, *James A. Toupin,* Deputy General Counsel, Office of the General Counsel, United States International Trade Commission, *(Shara L. Aranoff)* for defendant.

*Baker & Botts, L.L.P. (William D. Kramer* and *Clifford E. Stevens, Jr.)* for defendant-intervenor.

OPINION

RESTANI, *Judge:* This matter is before the court on a motion for judgment upon the agency record pursuant to USCIT Rule 56.2 by plaintiffs Companhia Paulista De Ferro-Ligas and Sibra Eletro Siderurgica Brasileira S/A (collectively "Paulista" or "Paulista Group"). Plaintiffs contest the affirmative material injury determination by the United States International Trade Commission (the "Commission") in the antidumping investigation of silicomanganese from Brazil, the People's Republic of China ("PRC"), Ukraine, and Venezuela. *See Silicomanganese from Brazil, the People's Republic of China, Ukraine, and Venezuela,* USITC Pub. 2836, Inv. Nos. 731–TA–671–674 (Dec. 1994) (affirmative final

[24] In sustaining defendants' approach with regard to the comparability required by section 609(b)(2), the court is constrained by the insinuations of their papers just filed to remind all who trawl for shrimp in the wild that TEDs are not a judicial solution to the problem of endangered species of sea turtles' drowning in the nets. Slip op. 95–208 simply concludes that the plaintiffs failed to prove that that approach by the U.S. government is contrary to law.

[25] Counsel for the defendants and the intervenor-defendant have requested that, if modification were denied, the court stay its December 29 order pending appeal. If these request(s) imply that a stay entails a different analysis, this court is unaware of such a standard, and the movants have not even attempted to show otherwise. Thus, their requests for a stay must also be hereby denied.

determ.) *("Final Det.")*. The Commission's affirmative material injury determination consists of a present material injury determination by Commissioners Rohr and Newquist and an affirmative threat of material injury determination by Chairman Watson. *See id.* at I–3. Plaintiffs contest only the affirmative material injury determination regarding imports from Brazil as unsupported by substantial evidence on the record or otherwise not in accordance with law.

## BACKGROUND

Silicomanganese is a metallic, silvery ferroalloy used primarily as an additive in the production of steel. It provides a source of both manganese and silicon for advanced products in iron and steelmaking. *Id.* at I–6. On November 9, 1993, Elkem Metals Co. ("Elkem"), and the Oil, Chemical and Atomic Workers, Local 3–639, filed a petition with the International Trade Administration of the United States Department of Commerce ("Commerce") and the Commission alleging material injury or threat of material injury by reason of less than fair value ("LTFV") imports of silicomanganese from Brazil, the PRC, Ukraine, and Venezuela. Commerce published affirmative final determinations on November 7, 1994, finding that imports of silicomanganese from Brazil, the PRC, and Venezuela were being sold in the United States at less than fair value. *See Silicomanganese From Brazil,* 59 Fed. Reg. 55,432 (Dep't Comm. 1994) (final det.); *Silicomanganese From the People's Republic of China,* 59 Fed. Reg. 55,435 (Dep't Comm. 1994) (final det.); *Silicomanganese From Venezuela,* 59 Fed. Reg. 55,436 (Dep't Comm. 1994) (final det.). On December 6, 1994, Commerce published a final affirmative determination of LTFV sales for Ukraine. *Silicomanganese From Ukraine,* 59 Fed. Reg. 62,711 (Dep't Comm. 1994) (final det.). The Commission made affirmative determinations with respect to LTFV imports from Brazil, the PRC, and Ukraine, and a negative determination with respect to imports from Venezuela. *Final Det.* at I–3; *see also Silicomanganese From Brazil, the People's Republic of China, Ukraine, and Venezuela,* 59 Fed. Reg. 65,788 (USITC 1994). On December 22, 1994, Commerce issued its antidumping duty order with respect to silicomanganese from Brazil. *See Silicomanganese From Brazil,* 59 Fed. Reg. 66,003 (Dep't Comm. 1994).

## STANDARD OF REVIEW

The court will hold unlawful those determinations of the Commission found to be unsupported by substantial evidence on the record, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i) (1994).

## DISCUSSION

### I. *Commissioners Rohr and Newquist's Determination:*

Commissioners Rohr and Newquist found one like product consisting of all silicomanganese and a domestic industry consisting of a single domestic producer, defendant-intervenor Elkem. *Final Det.* at I–7. They further determined that subject imports from the four countries should

be cumulated for purposes of their material injury analysis.[1] *Id.* at I–15. Plaintiffs do not contest these findings.

In assessing whether the domestic industry was materially injured by reason of LTFV imports, the Commissioners considered relevant economic factors that had a bearing on the condition of the domestic industry. *Id.* at I–9. They found that competition in the domestic market was an important factor in their determination. *Id.* Specifically, the Commissioners found that a large number of importers participate in the U.S. silicomanganese market; more than a dozen non-subject countries export silicomanganese to the United States; demand for advanced types of steel increased over the period of investigation ("POI"), thereby resulting in an increase in the amount of silicomanganese required;[2] the combination of inelastic demand in response to price changes and a high level of competition in the market results in buyers switching purchases among suppliers rather than increasing the overall amount of silicomanganese sold; and finally, because of the increasing derivative demand for the product, the principal effect of the large number of suppliers is likely to be found in the overall price level. *Id.*

The Commissioners reasoned that the nature of competition in the market "forced Elkem to adopt a strategy of lowering price to meet the competition from the subject imports." *Id.* at I–11. They found that Elkem's financial performance deteriorated over the POI specifically, while Elkem earned a net profit in 1991, it suffered an operating loss in 1992 and in 1993 suffered losses at all levels. *Id.* Although these trends began to reverse in interim 1994, Elkem's silicomanganese operation remained unprofitable. *Id.* Accordingly, the Commissioners found that "the domestic industry is currently experiencing material injury." *Id.*

Paulista challenges Commissioners Rohr and Newquist's determination that the domestic industry was injured by reason of the cumulated LTFV imports. Specifically, plaintiffs dispute the Commissioners' findings that 1) the increase in the volume of subject imports caused injury to the domestic industry's market share; 2) despite a finding of a mixed pattern of overselling and underselling, there was "significant" price underselling; and 3) lost sales and revenues demonstrated a shift in sales from the domestic product to subject imports.

Defendant and defendant-intervenor Elkem counter that plaintiff's objections go the weight the Commissioners accorded the evidence supporting their analyses and the Commission has the discretion to weigh the relevant factors. They contend that Commissioners Rohr and Newquist's material injury determination is supported by substantial evidence and otherwise in accordance with law.

---

[1] Plaintiffs appeal only the determination of the Commission regarding imports from Brazil, but when used herein, the term "subject imports" refers to imports of silicomanganese from Brazil, the PRC, Ukraine, and Venezuela.

[2] The Commissioners found that demand for silicomanganese was or is driven largely by the level of steel production. Over the POI, "the demand for advanced types of steel increased significantly, thereby resulting in an increase in the amount of silicomanganese required." *Final Det.* at I–9.

In determining whether a domestic industry is materially injured by reason of the imports under consideration, the Commission must consider:

> (I) the volume of imports of the merchandise which is the subject of the investigation,
> (II) the effect of imports of that merchandise on prices in the United States for like products, and
> (III) the impact of imports of such merchandise on domestic producers of like products, but only in the context of production operations within the United States.

19 U.S.C. § 1677(7)(B)(i) (1988). Pursuant to 19 U.S.C. § 1677(7)(B)(ii), the Commission may also consider "such other economic factors as are relevant to the determination." *Id.* No single factor, however, is determinative, and the Commission considers all relevant factors "within the context of the business cycle and conditions of competition that are distinctive to the affected industry." 19 U.S.C. § 1677(7)(C)(iii) (1988).

A. *Volume of LTFV Imports:*

The Commission found that the absolute volume of cumulated subject imports rose "steadily and significantly," increasing from 60,260 tons in 1991 to 184,741 tons in 1993, and from 61,315 tons in interim 1993 to 64,313 tons in interim 1994 (January–June). *Final Det.* at I–15–I–16. They also found that cumulated imports substantially increased their share of domestic consumption during the POI. *Id.* at I–16. These findings are not contested by the parties.

Paulista points out that the relevant statute dictates that "[i]n evaluating the volume of imports of merchandise, the Commission shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is *significant.*" 19 U.S.C. § 1677(7)(C)(i) (1988) (emphasis added). Paulista contends that as Elkem's share of domestic consumption did not decrease, the Commissioners did not, and could not, find that the volume of imports was significant. According to Paulista, the evidence in the record shows that any increase in the volume of subject imports did not injure the domestic industry, but was at the expense of non-subject imports' domestic market share. Plaintiffs, thus, claim that substantial evidence in the record does not exist to support a finding that the volume of imports caused material injury to the domestic market.

Defendant admits that the Commissioners did not explicitly find that the volume of subject imports was significant, but maintains that such a finding is not legally required to support an affirmative material injury determination. Although the Commissioners did not discuss the domestic industry's market share, the Commission is presumed to have considered the entire record absent evidence to the contrary. *See Nippon Steel Corp. v. United States,* Slip Op. 95–57 at 39–40 (Apr. 3, 1995); *see also Torrington Co. v. United States,* 16 CIT 220, 224, 790 F. Supp. 1161,

1167 (1992) (stating "[t]he fact that certain information is not discussed in a Commission determination does not establish that the Commission failed to consider that information"), *aff'd*, 991 F.2d 809 (Fed. Cir. 1993). The Commissioners reasonably relied upon the evidence in the record that the volume of subject imports rose by over 200 percent and the importers' share of domestic consumption increased substantially to make an affirmative injury finding despite evidence of stable or increasing domestic market share. *Final Det.* at I–15–I–16; *Views of Commissioners David B. Rohr and Don E. Newquist* (Confidential Version) [hereinafter *"Rohr/Newquist Conf. Det."*] at 20–21. The Commissioners, moreover, repeatedly found the volume of imports to be a significant factor (without expressly stating so)[3] in their analyses of the conditions of competition in the industry, price trends, and the financial condition of the domestic industry. Volume is normally more significant where fungible goods are involved. *See USX Corp. v. United States,* 11 CIT 82, 85, 655 F. Supp. 487, 490 (1987) (noting that for fungible product impact of seemingly small import volumes is magnified in marketplace). The court, thus, finds that the Commissioners did not err in their consideration of the volume of cumulated imports.

B. *Price Underselling:*

Commissioners Rohr and Newquist made four findings in assessing the price of cumulated subject imports. First, they found that prices for both the domestic product and the subject imports declined over most of the POI, recovering somewhat in late 1993. *Final Det.* at I–16. Second, they noted the decline in the unit values of both the domestic product and the cumulated subject imports, while the unit values of non-subject imports remained relatively stable. *Rohr/Newquist Conf. Det.* at 21–22. The Commissioners, however, placed little weight on the rise in prices and unit values in interim 1994, reasoning that they were a reaction to the filing of the petition. *Final Det.* at I–16 & n.86. Third, they found that the price declines between 1991 and 1993 occurred simultaneously with the import surge. *Final Det.* at I–16. Finally, the Commissioners found that the record revealed "a mixed pattern of underselling and overselling." *Id.* The data showed 21 instances of underselling and 19 instances of overselling in the contract market and 8 instances of underselling and 5 of overselling in the spot market. *Id.* The parties do not dispute these findings.

In evaluating the effect of imports of merchandise on prices, the Commission shall consider whether—

(I) there has been *significant* price underselling by the imported merchandise as compared with the price of like products of the United States, and

---

[3] Although the Commission did not explicitly state that the volume of imports was significant, "[t]he Commission * * * is not required to make explicit findings with respect to all factors that it considers." *Negev Phosphates, Ltd. v. United States,* 12 CIT 1074, 1083, 699 F. Supp. 938, 947 (1988). The finding seems implicit throughout the opinion.

(II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

19 U.S.C. § 1677(7)(C)(ii) (1988) (emphasis added).

Paulista argues that the Commissioners could not and did not find "significant" price underselling by the subject imports pursuant 19 U.S.C. § 1677(7)(C)(ii), as the pattern of underselling and overselling was mixed. Paulista also contends that, in the absence of significant price underselling, the Commissioners' finding that price underselling had a negative impact on the condition of the domestic industry" was not in accordance with law. Although Paulista concedes that the Commission may not be required to find price underselling in order to find adverse price effects, Paulista contends that once the Commissioners have considered whether there has been underselling, the statute requires it to be "significant" in order to support an affirmative material injury determination by reason of imports.

Defendant counters that Commissioners Rohr and Newquist never made a finding that price underselling had a negative impact on the condition of the domestic industry and points out that, in analyzing the effect of imports on domestic prices, the Commission must consider not only evidence of price undercutting, but also whether "the effect of imports of [subject] merchandise otherwise depresses prices to a significant degree." 19 U.S.C. § 1677(C)(ii).

The Commissioners found that imports did otherwise depress prices of domestic imports to a significant degree. *See Final Det.* at I–16–I–17. While Commissioners Rohr and Newquist found that the price underselling evidence was "mixed," in the case of both contract sales and spot sales, the subject imports undersold the domestic product in the majority of price comparisons. *Id.* at I–16. They found that the declining price of the LTFV imports, the increasing volume of the subject imports, the price-sensitive nature of competition, and the fungibility of silicomanganese combined to force Elkem to lower its prices and incur financial losses. *See id.* at I–15–I–17.

The Commission is not required to find significant price underselling to reach an affirmative material injury determination. *See Cemex, S.A. v. United States,* 16 CIT 251, 261, 790 F. Supp. 290, 299 (1992) (noting that "[t]o require findings of underselling would be inconsistent with the proposition that price suppression or depression is sufficient") *aff'd without op.,* 989 F.2d 1202 (Fed. Cir. 1993). The significance of the various factors affecting an industry necessarily depend upon the facts of each case. *Copperweld Corp. v. United States,* 12 CIT 148, 156, 682 F. Supp. 552, 565 (1988) (quoting S. Rep. No. 249, 96th Cong., 1st Sess. 88 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 474.) Congress recognized this in choosing to give the Commission broad discretion in analyzing and assessing the significance of the various factors affecting an industry. *Id.* The court finds that Commissioners Rohr and Newquist prop-

erly considered the price effects of the subject imports as required by the statute.

## C. *Lost Sales and Lost Revenues:*

Commissioners Rohr and Newquist further found that the impact of the LTFV imports was demonstrated by an examination of the lost sales and lost revenue allegations. *Final Det.* at I–16. In particular, the Commissioners found that "end users seldom know or care to know the source of the silicomanganese they buy." *Id.* The Commissioners found that "the only thing purchasers consistently agree on is that price is a very important factor." *Id.* at I–17. They found specifically, that the effect of lower prices is "to shift sales from fairly priced domestic product and non-subject imports to unfair [subject] imports." *Id.* Commissioner Rohr also relied on "basic economic analysis" to support the conclusion that "the price and volume of imports have had significant negative effects on the domestic industry." *Id.* at I–16 n.97.

Paulista argues that the Commissioners improperly relied on lost sales and lost revenue allegations that Commission staff was unable to confirm as support for a finding that purchasers switched sales from the domestic product to subject imports. Paulista further contends that, in any event, the Commissioners' finding that purchasers switched sales from domestic products to subject imports is not supported by substantial evidence as subject imports gained market share at the expense of non-subject imports, not domestic products.

Defendant counters that the Commissioners did not rely on the unconfirmed lost sales and lost revenue allegations in the Commission's report as proof of the matters asserted. Rather, defendant contends that the Commissioners relied on the general lost sales discussion contained in the Commission Staff Report indicating that lost sales allegations could not be confirmed as purchasers are generally unable to identify the suppliers' country of origin. *Final Det.* at I–16–I–17. This information, defendant asserts, was the basis for the Commissioners' conclusion that silicomanganese is a fungible product sold primarily on the basis of price, without concern as to supplier source. *Id.*

Defendant further argues that the Commissioners did not find that purchasers switched suppliers from domestic products to subject imports, but found that the *effect* of declining prices would be to shift sales "from fairly priced domestic product *and non-subject imports* to unfair" subject imports. *See id.* at I–17 (emphasis added). Defendant points out that the Commissioners found that Elkem resisted ceding market share by competing with LTFV imports on price, *see id.* at I–11, and, thus, the Commissioners did find that the gain in market share to subject imports was principally at the expense of non-subject imports, as Paulista contends.

Evidence of actual lost sales and lost revenues is not required to support a finding that the domestic industry is materially injured by reason of the subject imports. *See Acciai Speciali Terni, S.P.A v. United States,*

Slip Op. 95–142, at 12 (August 7, 1995) (noting that Commission not required to rest its decision on lost sales or lost revenues, as these may be only possible signals of impact) (citation omitted). Although evidence of lost sales and revenue may be probative, the lack of such evidence ordinarily will not vitiate a Commission determination. *Stalexport v. United States,* Slip Op. 95–96, at 57 (May 23, 1995).

The court finds that the Commissioners did not base their affirmative material injury determination in any significant way on the impact of subject imports on the domestic industry based on lost sales and lost revenue allegations that could not be confirmed. The Commissioners considered the conditions of competition in the silicomanganese market, the increase in absolute volume of subject imports, the significant decline in prices for silicomanganese over the POI, and the worsening financial condition of the domestic industry as a result of the negative effects of price and volume in arriving at their affirmative material injury determination. Under the substantial evidence standard, the court must affirm the Commission's determination so long as it is reasonable and supported by the record as a whole, even if there is evidence which detracts from the Commission's conclusions. *See Atlantic Sugar, Ltd. v. United States,* 744 F.2d 1556, 1563 (Fed. Cir. 1984). Accordingly, the court finds that Commissioners Rohr and Newquist's affirmative material injury determination is supported by substantial evidence and is in accordance with law.

## II. *Chairman Watson's Threat of Material Injury Determination:*

Chairman Watson determined that an industry in the United States is threatened with material injury by reason of LTFV imports of silicomanganese from Brazil. *Final Det.* at I–61. Chairman Watson found a single like product consisting of all silicomanganese and a single domestic producer, Elkem. *Id.* at I–22. Further, the Chairman concluded that imports from Brazil should not be cumulated with imports from any other country. *Id.* at I–61. The parties do not contest these findings.

For purposes of threat analysis, the Commission must consider, among other relevant economic factors:

> (II) any increase in production capacity or existing unused capacity in the exporting country likely to result in a significant increase in imports of the merchandise to the United States,
> (III) any rapid increase in United States market penetration and the likelihood that the penetration will increase to an injurious level,
> (IV) the probability that imports of the merchandise will enter the United States at prices that will have a depressing or suppressing effect on domestic prices of the merchandise,
> (V) any substantial increase in inventories of the merchandise in the United States,
> (VI) the presence of underutilized capacity for producing the merchandise in the exporting country,

(VII) any other demonstrable adverse trends that indicate the probability that the importation (or sale for importation) of the merchandise (whether or not it is actually being imported at the time) will be the cause of actual injury,

(VIII) the potential for product-shifting if production facilities owned or controlled by the foreign manufacturers, which can be used to produce products subject to investigation(s) under [19 U.S.C. § 1671 or § 1673] * * *, are also used to produce the merchandise under investigation,

*    *    *    *    *    *    *

(X) the actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the like product.

19 U.S.C. § 1677(7)(F)(i) (1988).[4] The statute also requires that a threat of material injury determination must be based on evidence that the threat is real and that actual injury is imminent. 19 U.S.C. § 1677(7)(F)(ii) (1988). Such a determination may not be made on the basis of mere conjecture or supposition. *Id.*

Chairman Watson made affirmative findings regarding many of the enumerated factors. He noted that the likelihood of a significant increase in imports in the near future was evidenced by the increases in Brazilian silicomanganese production capacity and the substantial underutilized production capacity in Brazil. *Views of Chairman Watson on Threat of Material Injury by Reason of LTFV Imports from Brazil* (Confidential Version) [hereinafter *"Watson Conf. Det."*] at 2. The Chairman found that Brazil's role as a large silicomanganese supplier to the United States and the substitutability of Brazilian imports for domestic product indicated a probability that imports were likely to have a depressing or suppressing effect on domestic prices. *Final Det.* at I–62–I–63. He further found that importers' end-of-period inventories of Brazilian silicomanganese rose significantly and that inventories of Brazilian silicomanganese increased both absolutely and as a ratio to imports, U.S. shipments, and to total shipments during the POI. *Id.* at I–63. He found no potential for product-shifting and no present negative effects on the domestic industry's development and production efforts, but concluded that these findings did not detract from his affirmative threat finding. *Id.* In sum, Chairman Watson determined that the likelihood of adverse price effects on the domestic product in the near future resulting from the combination of these factors posed a real and imminent threat of material injury to the domestic industry. *Id.*

A. *Absolute Volume of Imports:*

Paulista argues that Chairman Watson's reliance on absolute volume of imports rather than market penetration is not in accordance with law. Paulista points out that the statute requires the Commission to consider

---

[4] Subsections (I) and (IX) deal with subsidies and raw agricultural products, respectively, and do not apply to this investigation. *See* 19 U.S.C. § 1677(7)(F)(i)(I), (IX).

"any rapid increase in the United States market penetration and the likelihood that the penetration will increase to an injurious level." 19 U.S.C. § 1677(F)(i)(III). Paulista argues that "market penetration" is equivalent to "market share" and as the statute does not specifically require the Commission to consider the volume of imports, Chairman Watson's reliance on the increasing absolute volume of Brazilian imports, in lieu of Paulista's declining domestic market share, is not in accordance with law.

Defendant contends that the statutory term, market penetration, has never been defined so narrowly as to include only market share. Defendant claims that Chairman Watson reasonably interpreted "market penetration" to encompass a consideration of *both* absolute volume and domestic market share, considered both, and explained why he chose to rely on volume rather than market share data in the particular circumstances of this investigation. Chairman Watson stated that he "place[d] more weight on absolute volume changes as a predictor of future Brazilian presence in the United States market, since growing demand over the period of investigation attenuated significant redistribution of market share during the period of investigation." *Final Det.* at I–62. The court agrees that Paulista's narrow interpretation of the statutory term, market penetration, is untenable. The court finds that Chairman Watson, in choosing to rely on volume trend data to find the existence of a "rapid increase in market penetration" in the absence of rising market share, acted within his discretion to determine what weight to accord to the economic factors enumerated in the statute. *See Chung Ling Co., Ltd. v. United States,* 16 CIT 636, 648, 805 F. Supp. 45, 55 (1992) ('It is within the Commission's discretion to make reasonable interpretations of the evidence to determine the overall significance of any particular factor or piece of evidence.').

Paulista also contends substantial evidence does not exist in the record to support a finding that the absolute volume of imports from Brazil threaten material injury. In fact, Paulista asserts that Chairman Watson's finding that the increase in absolute volume of Brazilian imports from 1991 to 1993 would rise to an injurious level in the near future improperly ignores the evidence that the absolute volume of Brazilian imports declined between interim January–June 1993 and January–June 1994. Paulista points out an apparent contradiction between Chairman Watson's reliance on interim 1994 data in his present material injury analysis and his refusal to rely on such data for his threat of material injury determination.

Whether or not Chairman Watson should have placed even less weight on the interim data in the present material investigation, as Commissioners Rohr and Newquist did, his treatment of the data here was proper. In his threat determination, the Chairman explained that he was not relying on interim 1994 volume data because they were

> inconsistent with Brazil's record of steady participation in the United States silicomanganese market over the period of investiga-

tion, the increases in Brazil's absolute volume of exports to the United States over the period of investigation, and Brazil's increases in silicomanganese production and production capacity over the period of investigation.

*Watson Conf. Det.* at 3 n.10; *compare Final Det.* at I–41 n.27. Thus, Chairman Watson determined that the trend of rising import volumes had not reversed permanently, despite interim 1994 data. This finding is not inconsistent with his earlier finding in the present injury context that the rising import volume had not caused present material injury, as subject imports had not yet taken significant market share from the domestic industry or had adverse price effects because of increasing demand during the POI. *Final Det.* at I–38. The Commission has discretion to weigh evidence from different time periods and to determine which evidence is more probative of threat of injury. *See Metallverken Nederland B.V. v. United States,* 14 CIT 481, 484, 744 F. Supp. 281, 284 (1990) (upholding discounting of interim data in a threat determination). Accordingly, the court finds Chairman Watson's reliance on import volume trends reasonable and supported by substantial evidence.

## B. *Demonstrable Adverse Trends:*

Chairman Watson found that Brazil's status as one of the largest suppliers of silicomanganese imports to the United States throughout the POI and the single largest source of imported silicomanganese to the United States in 1993 (with 20.5 percent of total imports) constituted a "demonstrable adverse trend" indicating the probability that importation of Brazilian silicomanganese would be the cause of actual injury pursuant to 19 U.S.C. § 1677(F)(i)(VII). *Final Det.* at I–62. Paulista argues that such evidence is not evidence of a "demonstrable adverse trend" as Brazilian imports' gain in market share was not at the expense of the domestic industry during the POI and as the price underselling data for Brazilian imports does support a finding of threat of material injury.

Paulista's argument is without merit. Paulista mistakenly assumes that evidence relied on by the Commission as "any other demonstrable trends" must show actual present injury to the domestic industry. Chairman Watson found that Brazil's increasing volume of imports, making it the single largest source of imported silicomanganese to the Unites States, combined with other economic factors, such as declining shipments in Brazil, increases in Brazil's production capacity, and very low capacity utilization, reasonably demonstrates a probability that Brazilian imports will be a cause of actual injury in the near future. *See id.* at I–62 n.11.

## C. *Production Capacity and Unused Capacity:*

Chairman Watson found that there was an increase in Brazilian production capacity from 1991 to 1993 and existing unused capacity during the same period. *Watson Conf. Det.* at 2. The Chairman rejected Paulis-

ta's claim that Brazil's production capacity was likely to decline in the future due to plant closings, a bankruptcy filing, and the planned transfer of ownership of certain facilities. *Final Det.* at I–61. The Chairman stated that he viewed "such claims as speculative given that the transfer of ownership has not yet occurred and that factual evidence of the events that [one exporter] claim[s] will result from the transfer has not been presented to the Commission." *Id.* Furthermore, the closings were likely to be of outmoded plants, which might simply make the producer more efficient while not affecting production significantly. *See* Tr. of Proceedings Before U.S. Int'l Trade Comm'n (Nov. 3, 1994), List 1, Doc. 97, at 163–64.

Paulista argues that production capacity and unused capacity data relied upon by Chairman Watson do not show an imminent threat of material injury. Paulista claims that the Chairman improperly relied on the data of one company, Sibra, as opposed to the data for the exporting country as a whole. *See* 19 U.S.C. § 1677(7)(F)(i)(II) (requiring Commission to examine "any increase in production capacity or existing unused capacity in the *exporting country*") (emphasis added). Paulista also asserts that Chairman Watson ignored the interim data for the most recent period (January–June 1993 as compared to January–June 1994), which show a substantial decline in Brazilian production capacity, and recent interim data showing that Brazil's capacity utilization increased in January–June 1994 over what it had been in January–June 1993, reducing the amount of unused capacity.

Defendant counters that Chairman Watson did not ignore Paulista's claim to be operating at full capacity during the POI. In his discussion of capacity utilization, the Chairman relied on a report compiled from Paulista and Sibra's own questionnaire responses. *See Final Det.* at I–61 n.2–n.5 (citing Conf. Staff Rep., tbl. 17, at I–67). The Commission Staff Report also reflects the fact that a director of Sibra testified at the Commission's hearing that Paulista Group's[5] theoretical capacity for production of silicomanganese, as reported to the Commission in its questionnaire responses, is never achieved, because part of that capacity is used for the production of other ferroalloys. Defendant contends that Chairman Watson considered and rejected this testimony. *See* Conf. Staff Rep., tbl. 17, at I–67.

The Chairman did choose to accept information submitted to the Commission by Elkem that Sibra is expected to nearly double silicomanganese output from 1993 to 1994 due to a full year's operation of a new plant, *Watson Conf. Det.* at 3 n.7, but this does not compel him to accept testimony that overall useful production capacity would decline significantly.

The Commission is presumed to have considered the entire record. *See Hosiden Corp. v. United States,* 852 F. Supp. 1050, 1056 (Ct. Int'l Trade 1994). The court finds that Chairman Watson reasonably

---

[5] The Paulista Group consists of Paulista and its subsidiary, Sibra.

declined to rely on the Paulista Group's interim 1994 production capacity and unused capacity data and 1994–1995 projections as a predictor of the group's future conduct. The Chairman regarded the data as inconsistent with Paulista's pattern of conduct during the POI and concluded that the data could not be reconciled with other record evidence. *See Watson Conf. Det.* at 3 n.10. He found that between 1991 and 1993, expanding and underutilized capacity permitted Brazil to increase significantly its volume of exports to the United States and rise to the single largest source of silicomanganese imports in the United States market, while both exports to third country markets and home market consumption declined. *Watson Conf. Det.* at 1–2. The court finds that Chairman Watson acted within his discretion to weigh the evidence presented and accord it the significance he deemed proper as trier of fact. *See Maine Potato Council v. United States,* 9 CIT 293, 300, 613 F. Supp. 1237, 1244 (1985) ("It is within the Commission's discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor or piece of evidence.").

D. *Increased Inventories:*

Chairman Watson found support for his threat determination based on the fact that "[i]mporters' end-of-period inventories of Brazilian silicomanganese rose significantly from 1991 to 1993 and between the 1993–94 interim periods," and that importers' inventories of Brazilian silicomanganese increased, both in absolute terms and as a ratio of imports, U.S. shipments, and total shipments over the POI. *Final Det.* at I–63. Paulista contests the Chairman's reliance on this data in light of the fact that domestic inventories of Brazilian imports which existed throughout the POI did not translate into an increase in Brazil's share of the domestic market, which declined during this period. On this basis, Paulista argues that its increased inventories cannot support a finding of an imminent and real threat of material injury. Paulista again ignores the price effects of the presence of the large volume of the fungible commodity in the market or in inventory.

The statute mandates the Commission to consider whether there had been "any substantial increase in inventories of the merchandise in the United States." 19 U.S.C. § 1677(7)(F)(i)(V). It does not require an isolated finding, as Paulista contends, "that such inventories would lead to imminent and real increased market penetration." Increased inventories can contribute to future material injury by increasing the volume of the product on the market or by suppressing or depressing prices even if held in inventory by overhanging the market. *See Bando Chem. Indus., Ltd. v. United States,* 17 CIT 798, 811–12 (1993) (upholding Commissioner's reliance on price depressing or suppressing effects of foreign inventories), *aff'd without op.,* 26 F.3d 139 (Fed. Cir. 1994). Accordingly, the court finds Chairman Watson's reliance on increased inventories as support for his threat determination proper. In sum, the court finds that the threat of material injury determination of Chairman Watson and

the present material injury determination of Commissioners Rohr and Newquist are supported by substantial evidence and are otherwise in accordance with law.